IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT WILLIAM HAROLD, Administrator | : | |
| of the Estate of ROBERT GEORGE HAROLD | : | CIVIL ACTION |
| | : | |
| *plaintiff,* | : | No. 05-1493 ABB |
| | : | |
| vs. | : | JURY TRIAL DEMANDED |
| | : | |
| BRYAN A. McGANN, Individually, | : | |
| PILL POCKETS, INC., and S & M NuTec, LLC | : | |
| | : | |
| *defendants.* | : | |

## PLAINTIFF'S CONSOLIDATED OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

Although represented by the same counsel, Defendants Bryan McGann and Pill Pockets,

Inc. and Defendant S&M Nu Tec have filed separate motions to dismiss.  To conserve the

Court's resources, and avoid duplication of efforts, Plaintiff files one consolidated opposition to

Defendants' Motions. For the reasons set forth in the accompanying Memorandum of Law,

Plaintiff respectfully requests that this Honorable Court deny Defendants' Motions to Dismiss.

Respectfully submitted,

_____
NEIL E. JOKELSON, ESQUIRE
DAVID E. JOKELSON, ESQUIRE
DEREK E. JOKELSON, ESQUIRE
Neil E. Jokelson & Associates, P.C.
230 South Broad Street, 18th Floor
Philadelphia, PA 19102
(215) 735-7556
Counsel for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT WILLIAM HAROLD, Administrator | : | |
| of the Estate of ROBERT GEORGE HAROLD | : | CIVIL ACTION |
| | : | |
| *plaintiff,* | : | No. 05-1493 ABB |
| | : | |
| vs. | : | JURY TRIAL DEMANDED |
| | : | |
| BRYAN A. McGANN, Individually, | : | |
| PILL POCKETS, INC., and S & M NuTec, LLC | : | |
| | : | |
| *defendants.* | : | |

### MEMORANDUM OF LAW SUPPORTING
### PLAINTIFF'S CONSOLIDATED OPPOSITION
### TO DEFENDANTS' MOTIONS TO DISMISS

For the reasons set forth below, Defendants' Motions to Dismiss should be denied.  To conserve the Court's resources, and avoid duplication of efforts, Plaintiff files this one legal memoranda.

**1.      Standard of Review**

"Rule 12(b)(6) [] is designed to screen out cases where 'a complaint states a claim based upon a wrong for which there is clearly no remedy, or a claim which the plaintiff is without right or power to assert and for which no relief could possibly be granted . . ..'" Port Auth. v. Arcadian Corp, 189 F.3d 305, 312 (3d Cir. 1999).  When reviewing a request for dismissal for failure to state a claim upon which relief can be granted, the district court must accept as "admitted and proved" "all facts contained in the complaint and every inference fairly deducible therefrom, taking into consideration any factual information the Court can take judicial notice of, . . . viewing the same in the light most favorable to the plaintiff."  Melo-Sonics Corp. v. Cropp,

342 F.2d 856, 858 (3d Cir. 1965). This includes facts alleged on information and belief. Id. at

859. Upon accepting as admitted and proven all allegations of record, dismissal may not be had

"no matter how likely it may seem that the pleader will be unable to prove his case" "unless it

appears to a certainty that the plaintiff would not be entitled to relief under any state of facts

which could be proved in support of his claim." Id. at 858. Accordingly, "courts strongly

disfavor Rule 12(b)(6) motions." Jackson v. Baddick, 2004 U.S. Dist. LEXIS 15154. *16

(E.D.Pa. 2004). Genentech has not met this burden.

 Moreover, "Federal Rule of Civil Procedure 8(a)(2) ... provides that a complaint must

include only a short and plain statement of the claim showing that the pleader is entitled to relief.

Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and

the grounds upon which it rests." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (U.S., 2002)

(citing Conley v. Gibson, 355 U.S. 41 (1957)).

 "The *prima facie* case [concept] is an evidentiary standard, not a pleading requirement."

Swierkiewicz, 534 U.S. at 510. Hence,"[t]his simplified notice pleading standard relies on

liberal discovery rules and summary judgment motions to define disputed facts and issues and to

dispose of unmeritorious claims." Swierkiewicz, 534 U.S. at 512.

 "These requirements are exemplified by the Federal Rules of Civil Procedure Forms,

which 'are sufficient under the rules and are intended to indicate the simplicity and brevity of

statement which the rules contemplate.' *Fed. Rule Civ. Proc. 84*." Swierkiewicz, 534 U.S. at

513. "For example, Form 9 sets forth a complaint for negligence in which plaintiff simply states

in relevant part: 'On June 1, 1936, in a public highway called Boylston Street in Boston,

Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then

2

crossing said highway.'" Id.

"Given the Federal Rules's simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Swierkiewicz, supra, quoting Conley, supra.

As for fraud, Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." While allegations reciting the date, place or time when the fraud occurred are usually sufficient to satisfy Rule 9(b), "nothing in the rule requires them." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). Accordingly, a plaintiff may use alternative means to inject precision and some measure of substantiation in their allegations of fraud. Id.

The Third Circuit has cautioned that "focusing exclusively on [Rule 9(b)'s] particularity language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" Christidis v. First Pa. Mortgage Trust, 717 F.2d 96, 100 (3d Cir. 1983) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1298, at 407 (1969)). The Third Circuit also directs district courts to "be sensitive to the fact that [harsh application of the Rule] . . . may permit sophisticated defrauders to successfully conceal the details of their fraud." Christidis v. First Penn. Mortgage Trust, 717 F.2d 96, 99-100 (3d Cir. 1983); accord Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir., 1992). Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Craftmatic Sec. Litigation v. Kraftsow, 890 F.2d 628, 645 (3d Cir.,

1989). Finally, in Pennsylvania, where a confidential relationship between the parties exists and "the party in whom the confidence is reposed obtains an apparent advantage over the other, he [or she] is presumed to have obtained that advantage fraudulently." Matter of Estate of Evasew, 526 Pa. 98, 584 A.2d 910, 912-13 (Pa. 1990).

2.      **Statement of Facts**[1]

Accepting all facts in the complaint and all reasonable inferences therefrom as admitted and proven, and viewing same in the light most favorable to Plaintiff, the record reveals the following.

On August 15, 1989, the United States Patent Office issued Patent No. 4,857,333 ("the Patent") to Plaintiff's decedent, Robert George Harold, for his invention for "FOOD PRODUCT FOR ADMINISTERING MEDICATION TO ANIMALS." ¶ 1. The Patent covered the invention of a "formed, chewable food treat with at least one pre-formed pocket therein opening to an outer surface of the treat and sized to retain a medicant therein." Cmplt. Exh. A.

In April 1997, Defendant Bryan McGann approached Mr. Harold to purchase the Patent. Mr. McGann initiated this solicitation of Mr. Harold, whom he came to understand at or around this time was, with his wife Dorothy Harold, "having tough days" and that both Mr. and Mrs. Harold were in "pain." ¶14 & 16. Cmplt. Exh. D. As a result of their discussions, on May 15, 1997, Mr. McGann forwarded to Mr. Harold a cover letter enclosing a Letter Agreement for his

---

[1]Defendants have attached two documents from outside the record. To complete alleged facts presented in those documents, Plaintiff attaches further correspondence as well as redacted transactional documents and a Trust Report which have been produced in early discovery. These latter documents are presently before the Court as Exhibits to Plaintiff's Motion to Compel.

4

counter signature to effect a sale and assignment of the Patent, a check for $500.00 and a document styled Assignment of U.S. Patent. ¶16.  Cmplt. Exh. B.  As Mr. McGann explained in his cover letter, "[m]y attorney said that the letter format I had was fine for our purposes as long as it is backed up by the formal assignment and sale agreement for recording in the patent office."  Cmplt Exh. B.

The purchase price stated in the Letter Agreement included an unconditional payment of $500.00 by the check accompanying the Letter Agreement as well as the promise to pay a 5% royalty on net sales of products covered by the patent as follows:

> **Bryan McGann will pay to Bob Harold a royalty of 5% on net sales of products** covered by the claims of the patent, **up to a total cap of $100,000.00 in cumulative royalty payments.**  This royalty cap represents cumulative net sales of $2,000,000.00.  **Bryan McGann will report semi-annually to Bob Harold on the net sales of the product covered by this patent.**[2]

Id. (Emphasis supplied).  Moreover, as Mr. McGann explained in his cover letter, in the event the Patent were sold to another party, the "[Letter] [A]greement [would] survive[] any sale and will be the responsibility of any future owner of the patent." Id.  To effect this intent, Mr. McGann worded the Letter Agreement to state "simply" that:

> If the patent is sold to another party, this agreement will survive the sale as a contingent payment obligation provided that the total payments to Bob Harold have not exceeded the $100,000.00 royalty cap.

Id.

Mr. Harold signed the Letter Agreement on May 19, 1997. (The Harold Letter Agreement is hereafter referred to as the "HLA").  ¶17.  That same day, he also executed the

---

[2]As further consideration, the parties agreed that in the event the patent were infringed and a settlement were achieved, then "Bryan McGann, or the then owner of the patent, will pay to Bob Harold 5% of the net settlement amount (less costs, attorney fees etc.) up to $100,000.00.

Assignment of U.S. Patent assigning his "entire right, title and interest in and to said invention and Letters Patent" to Mr. McGann.  Cmplt. Exh. B.

As detailed below, both Mr. McGann and Pill Pockets, Inc. ("PPI"), the corporation formed by Mr. McGann to become the successor-in-interest to the Patent, have defrauded Mr. Harold and his heirs and entirely failed to perform under the terms of the HLA, with the sole exception being the initial $500.00 payment made to induce Mr. Harold to sell and assign his invention and valuable patent rights.[3]  While products covered by the Patent have generated net sales in excess of $835,000 through December 31, 2004 (upon which royalties should have exceeded $41,000), the record reflects that neither Mr. McGann nor PPI have ever reported net sales as required by the Letter Agreement, nor did they ever pay royalties on account of net sales.

Instead, after neglecting the Patent until some time in 2002, Mr. McGann, both individually and on behalf of PPI, continually reassured Mr. Harold and his heirs that he would honor the HLA but represented that "no money was being made" and he "was not even taking a salary" to create the false impression that products covered by the Patent were not generating significant sales.  Indeed, when making these or similar representations in writing, Mr. McGann purposely identified himself as a Doctor of Jurisprudence to further engender the Harolds' trust and confidence.  These misrepresentations and failures to account for net sales as required by the

---

[3]While PPI and McGann disbursed $1000.00 and $500 to Mrs. Harold in January and September 2004, respectively, neither of these payments were on account of royalties due on net sales.  Instead, as detailed below, these payments were purposely mis-characterized to conceal the fact that products covered by the Patent were generating significant net sales.  No other payments have been made to Mr. Harold or the estate or his heirs, nor have any royalty payments been made on account of net sales which exceed $800,000.00.

HLA were part of a conspiracy by and between McGann and PPI to convert Plaintiff's property (including the royalty payments already due and owing) to their own use.  Indeed Defendants now admit that the monies due the Harold's from net sales were diverted and used by Defendants "for the investment of seed capital to build and fund the business."  McGann Memorandum of Law at 6.[4]  This business "buil[t] and fund[ed]" with the Harolds' funds has now been sold by Defendants McGann and PPI to Defendant S&M NuTec for more than four million dollars.

Both before and on May 15, 1997, Defendant McGann represented to Mr. Harold, expressly and/or impliedly, that he would produce and market a product covered by the Patent and that he would do so in a prompt and commercially reasonable fashion to generate sales. ¶21&23.  In this regard, Mr. McGann provided in the Letter Agreement that "[i]n the event of **unforeseen delays** in the generation of sales, Bob Harold can exchange his royalty options for cash equal to $3,000.00."  Exh. B.  (Emphasis supplied).  Towards that purpose to act promptly,

---

[4]This admission as well as other contentions in Defendants' Motions to Dismiss assert "facts" outside the record in an attempt to persuade the Court to dismiss Plaintiff's Complaint. While Plaintiff is accepting of the limited admission, for the purpose of this motion, that monies from net sales were used by Defendants "for the investment of seed capital to build and fund the business," many of the contentions are disputed, including allegations to the effect that:

•    "McGann and Plaintiff agreed to convert the method of payment under the Harold/McGann Contract from a royalty on sales to a royalty on dividends" McGann Memorandum of Law at 6; and

•    "royalties were placed in escrow for the benefit of the Harold estate." Id.

To the extent this Court considers the substance of these disputed matters, Plaintiff requests leave to amend the Complaint to allege, *inter alia*, facts demonstrating the Harolds' lack of education, sophistication and business acumen, including their lack of understanding of the differences between terms used by Defendants including "royalties on dividends," "royalties on sales" and "royalt[y] on equity," and that Defendants only placed any monies in the purported escrow account after Plaintiff, through counsel, rescinded the HLA.

Messrs. Harold and McGann entered into a further agreement in August 1997, wherein Mr.

Harold assigned to Mr. McGann any rights that he held to the potential trade name

"STOWAWAY" together with art work and a copyright thereto pertaining to original art work to

market the product as had been developed by or on behalf of Mr. Harold.  Cmplt. Exh. C.

Unbeknownst to Mr. Harold, in or around 1998 Mr. McGann, instead of marketing and

producing the product as contemplated by the HLA, enrolled in and attended law school at the

University of North Carolina at Chapel Hill where he subsequently obtained his law degree.

¶26.   Upon information and belief, Mr. McGann did not communicate at any time with Mr.

Harold from in or about the middle of 1998 until on or about March 14, 2002 when he wrote to

Mr. and Mrs. Harold:

> I know this letter must find you quite surprised since it has been so long.
> Given the twists and turns over the last few years, I am a little surprised to have
> the opportunity to write you with possible good news. In 1998 I returned to
> school and earned my law degree from the University of North Carolina at Chapel
> Hill. I have never lost my desire to get Stow Away to market, but as time went by,
> each opportunity seemed to have a catch that thwarted my efforts. On a more
> positive note, I have a four year old that has kept my non-law school attention.
>
> Now I am able to give you a different report. I am involved with an
> individual in Colorado who obtained a patent in 2000 on different designs of Stow
> Away. While she cannot make her product without violating the Harold patent,
> she has the trademark on the name Pill Pockets which has received great praise in
> consumer focus groups. She is also very well connected in many of the veterinary
> circles and has given us the contacts we needed to move ahead full speed. In July
> of this year, we will introduce the product at the AVMA Convention in Nashville.
> We are displaying the product in an exhibitor booth and will hold a news
> conference along with some of our veterinary consultants. In all, we hope to build
> this effort quickly, and hope to entertain offers in the near future to purchase the
> product. Either way, however, we have received a great deal of support and
> enthusiastic cooperation as we have worked to get to this point. I will keep you
> informed of all events as they unfold.
>
> I hope this letter finds you well. I know that you were having tough days
> back in 1997 and 1998 and I pray that you have found relief form the pain you

described. I look forward to talking with you soon. Take good care.

¶26 and Cmplt. Exh. D.  By stating in the March 14, 2002 letter that "I will keep you informed of all events as they unfold," Mr. McGann hoped to gain the further support, trust and confidence of Mr. and Mrs. Harold.  ¶28.  To further engender trust and confidence, Mr. McGann identified himself on the signature line as a Doctor of Jurisprudence and an MBA.  Cmplt. Exh. D.

Mr. and Mrs. Harold responded by email dated July 13, 2002.  The Harolds explained that they were "thrilled to death as this was the first piece of good news in our life for a long long time" and that they "had been under EXTREME stress for many months."

> My wife's mother started with alzheimers disease last year. She had been living alone in her own home for the past 25 years and we would help her whenever she needed it, Pay her bills, see to her medicines, doctors visits, etc. Over the past several months her health deteriorated and we became nursing aides on a daily basis. Finally we had to place her in a assisted living facility as it became Overwhelming for us. Now my mother-in-law had no money except for her home valued at 100K. All of a sudden out of the woodwork my in-laws (Dot's brother and sister-in-law) show up. They only came around once or twice a year to visit even though they only lived 80 miles away. Now they have her sign over and sell her home, get power of attorney and move her close to where they live.

> We couldn't contest anything as unfortunately I lost mostly all of my retirement and savings over the past few years as three of my investment companies went bankrupt. Along with all of this my step father is in a rehab facility recovering from a stroke. Now my mother is by herself and wants me to come see her more often as she is afraid to live alone. She lives seventy miles away in New Jersey. Well as you might have guessed my migraines are much worse causing me to seek medical attention weekly. (Narcotic injections) Unfortunately none of the new migraine medications help me...Now I'm really sure you understand how happy Dot and I were after hearing from you.

Cmplt. Exh. E.  On September 29, 2002, Robert George Harold died. ¶30.

After Mr. Harold died, his son Robert William Harold called Mr. McGann to inform him that Mr. Harold passed away.  ¶31.  Mr. McGann assured Robert William Harold that he would honor the original HLA.  ¶31.  Shortly thereafter, Mr. McGann called Dorothy Harold, Mr.

9

Harold's widow, and again confirmed that he "would honor the contract" or words to that effect. ¶32.  Mr. McGann, however, never intended to honor the terms of the HLA or the promises to Robert William Harold and Dorothy Harold that he would honor the HLA.  ¶33.  Thereafter, for the remainder of 2002 through early 2005, Robert William Harold would periodically call McGann to ask for updates.  At no point did Mr. McGann inform Robert William Harold of any net sales of product.  Instead, Defendant McGann told Robert William Harold on one or more occasions that no money was being made and that Defendant McGann was not even taking a salary.  ¶37.

In 2003, Mr. McGann incorporated Defendant Pill Pockets Inc. (PPI), naming himself as President and Chief Executive Officer, and transferred ownership of the Patent to PPI. ¶34. Unbeknownst to Plaintiff,  however, Mr. McGann violated the HLA by transferring the Patent to PPI without executing appropriate documents to ensure that the HLA survived the transfer as the responsibility of PPI, as called for in the HLA.  ¶35.  This violation of the HLA, although unknown to the Harolds, appears to be confirmed by PPI in a Preferred Stock Purchase Agreement ("PSPA") it entered on February 19, 2003.  Exh. A.[5]  The "DISCLOSURE SCHEDULE" attached as Exhibit D to the PSPA memorializes that Mr. McGann was to "remain[] responsible for the payment" owed under the HLA "and for the reporting requirements detailed in the letter of agreement."

Moreover, the drafter(s) of the PSPA, to which PPI and presumably Mr. McGann were parties, blatantly misrepresented the terms of the HLA. While the HLA expressly provided that

_____

[5]The PSPA was never shared with Plaintiff or any of the heirs to the estate at any relevant time.  A redacted form of this agreement was first produced on May 17, 2005 after the Complaint was filed.

its terms would survive any sale of the Patent and that any future owner of the Patent would remain "responsible" for complying with those terms, including the obligation to pay a royalty of 5% of the net sales, the PSPA appears to reflect a decision by PPI and McGann to distort the meaning of these terms.  Under this purposeful distortion by the Defendants, the Estate of Robert Harold would lose its entitlement to 5% of all net sales, and instead be limited to 5% of any dividends or proceeds PPI chose to disburse to Mr. McGann, thereby enabling PPI, by electing not to pay "dividends" or "proceeds" to Mr. McGann, to unilaterally and at the expense of Plaintiff funnel all net sales revenues back into the business to grow and expand same. Moreover, the Harolds would no longer be creditors, but instead would have a subordinated "equity" position.  Paragraph 1 of the Disclosure Schedule provides in relevant part as follows:

> Agreement with Robert Harold. Pursuant to the terms of the attached letter agreement, partial compensation for the purchase of the Harold patent included various provisions to pay Harold either 5% of net sales of the product if sold directly by McGann, or participate in 5% of any proceeds received by McGann in the event of sale, assignment or infringement of the patent up to a cumulative cap of $100,000. Pursuant to bullet point five in the letter agreement, if the patent is sold or assigned to another party, McGann's obligation survives and payments would be paid from any dividends or proceeds received by McGann. McGann remains responsible for the payment of this amount and for the reporting requirements detailed in the letter of agreement. Though Harold has since passed away, McGann will make payment directly to his spouse.

This statement does not accurately describe the terms of the HLA which clearly provide that royalties will always be paid by the patent's owner on net sales, not on dividends which a corporation such as PPI could choose not to pay out.  Neither PPI nor Mr. McGann expressly informed the Harolds of this unilateral change.  Indeed, Mr. McGann, in what appears to be a part of his continuing acts of deception, expressly assured the Harolds as late at March 3, 2005 that "the current agreement between us calls for payment on sales of product."  Cmplt Exh. H.

11

In the second six months of 2003, net sales of products covered by the Patent exceeded $35,000.  ¶38. Pursuant to the terms of the HLA, the royalty due the Plaintiff on those net sales would exceed $1,800.  ¶38. Mr. McGann and PPI, however, did not report these net sales figures or make payment of the royalty on account of those net sales as called for in the HLA.  ¶38-39. Instead, Mr. McGann, signing as "JD" for Doctor of Jurisprudence on PPI letterhead, wrote to Dorothy Harold on January 15, 2004 and enclosed a check made payable to her for $1,000.00. ¶39. This payment, however, was not made on account of the 5% royalty on net sales per the terms of the contract, but, according to McGann and PPI, represented "5% of the proceeds received in the merger with the Colorado company."  ¶40 and Cmplt. Exh. F.  To further engender the Harolds' confidence, trust and support as part of his scheme to defraud them, Mr. McGann promised to increase his reports to quarterly from semi-annually.

> I hope this letter finds you well. Much has happened since we last spoke on the phone and I wanted to give you an update on the progress that Pill Pockets is making. Last year we merged with an investment group out of Colorado in exchange for a contribution of capital. This allowed us to build a plant in North Carolina in which we manufacture and distribute the product. So far, we have accomplished that task and we are now beginning to promote and actively market Pill Pockets for both dogs and cats. This changed my ownership of the Harold patents, but as I had agreed to do with Mr. Harold back in 1997, the agreement between us remains my personal obligation. I am happy to send you that portion of any dividends or equity I receive up to the stated maximum, and I must tell you, I believe we will reach that maximum!

> **I am enclosing your first check for $1,000 that represents 5% of the proceeds received in the merger with the Colorado company.**  I spoke with you son recently and told him that **I will also be reporting to you on a quarterly basis instead of twice of year as called for in the agreement.** This will keep you better informed of the happenings of the company.

> I have enclosed samples of our product. I am truly excited about the possibilities we have to make this effort successful. I look forward to writing again soon.

Cmplt. Exh. F.  Neither Mr. McGann nor PPI, however, made the quarterly reports promised in the January 15, 2004 letter or reported semi-annually, or otherwise, on any net sales from May 1997 up until March 2005. ¶41.

Net sales of products covered by the Patent exceeded $300,000 in the first six months of 2004 such that the royalties owed the Plaintiff would exceed $15,000 under the HLA.  ¶43. Again, instead of paying the royalty on net sales, Mr. McGann wrote to Mrs. Harold on September 14, 2004, and offered a check for $500 as an "**Advance** on Royalty Payments."  ¶44 and Cmplt.Exh. G.  (Emphasis supplied).  Again, Mr. McGann wrote on PPI letterhead and signed as a Doctor of Jurisprudence as well as a Ph.D.:

> As you can see, we are nearing the point where we will be a profitable company with a broad product line. Our cat Pill Pockets have quickly become our best sellers since cat owners have no alternative other than stuffing the pill down the cat's throat. I am enclosing an email I received today from a cat owner who has found Pill Pockets to be a life-saver. **I am also enclosing a check for $500 for you. Even though I am not taking a salary and we have yet to reach break-even, I believe that will change soon and I will regularly receive salary and dividends and checks to you will become more regular.** I apologize for not writing sooner, I have been traveling for 6 months to all of these shows. We have now hired a Vice President of Sales who will take over for a lot of this travel and allow me to upgrade our administrative processes here at the home office. My wife and I are expecting a son in December so she is forcing me to stay home now!

Cmplt. Exh. G.  (Emphasis supplied).  In truth and in fact no "**Advance**" on royalty payments needed to be made as Mr. McGann and PPI had already realized substantial sales which should have generated royalty payments well in excess of the $500.00.  ¶46.  (Emphasis supplied).  By failing to properly account for the net sales, and by characterizing the payment as an "advance," Defendants McGann and PPI materially and deliberately misled the Harolds as part of their continuing scheme to defraud and concealed from them material information which they had a

13

duty to disclose including, but not limited to, the fact that funds due were not being paid but instead were being converted by Defendants McGann and PPI for their own use and benefit all in violation of their fiduciary duty. ¶46.

In the second half of 2004, net sales on products covered by the Patent exceeded $500,000.00 (upon which the royalty on net sales would exceed $25,000).  ¶47.  Again, defendants failed to pay the Harolds the royalty thereon. ¶48.

On or about January 28, 2005, unknown to the Harolds at the time, PPI entered into a "non binding letter of intent" with Defendant S&M NuTec contemplating the sale of substantially all "Net Assets" of PPI, the major constituent part of which was the Patent purchased by Mr. McGann from Robert George Harold pursuant to the HLA.[6]  ¶51 and Cmplt. Exh. H.  This letter of intent contemplated a sale price of at least $4,100,000.00 with $2,000,000.00 payable at closing to McGann/PPI and the balance payable over a two year period along with royalty payments of 7% of net sales per calendar year through May of 2008 and the greater of 6% of net sales or $250,000.00 per year thereafter through December 31, 2017. ¶52. As reflected in the cover letter from S&M NuTec, Inc., this offer was based upon S&M NuTec's review of the PPI's "financials, pro form, and other information" which PPI "openly provided." Cmplt. Exh. H.  Further, each party "reserve[d] the right to conduct any remaining due diligence they may deem necessary prior to closing of the transaction."  Id.

In or about early March 2005, most likely March 2 or 3, 2005, Mr. McGann, persisting in his scheme to defraud contacted Robert William Harold stating that he was close to selling the

---

[6]The parties defined "Net Assets" to mean all assets and liabilities of PPI except those specifically excluded by the agreement of the parties.

Patent to S&M NuTec, Inc., and that in order to close the transaction, he needed some paperwork signed, and that Dorothy Harold would get "the  substantial amount of $14,630" after closing so long as she signed off on some required paperwork by the weekend as closing was scheduled for Monday March 7, 2005. ¶53.  Mr. McGann (acting on his own behalf and on behalf of PPI) deliberately concealed from the Harolds the fact that royalty payments then due the Harolds exceeded $40,000 based upon net sales exceeding $800,000 through year end 2004 and created the false impression that no such monies were owed and that the "the substantial amount of $14,630" was somehow derived from the sale to S&M NuTec. ¶54.  Such action was taken to advance the civil conspiracy described in the complaint. ¶54.

Shortly thereafter, at 5:42 p.m on Thursday March 3, 2005, Mr. McGann faxed Robert William Harold a letter following-up on their telephone conversation.  ¶55.  Again Mr. McGann identified himself on his signature line as a Doctor of Jurisprudence as well as a Ph.D. and President, Chairman and CEO of PPI, and attached to the letter the executed S&M NuTec Non Binding Letter of Intent dated January 28, 2005 and the accompanying cover letter dated January 19, 2005, as well as a "new" Letter Agreement for Dorothy Harold to counter sign for the Estate of Robert Harold.  Cmplt. Exh. H. This proposed "new" Letter Agreement, however, along with the cover letter were sent in an attempt to further McGann and PPI's civil conspiracy and defraud the Harolds from their just entitlements to royalties on net sales and to keep concealed from them the defalcations, misappropriations and conversions of the royalty payments previously due and owing to the Harolds as well as the breaches of fiduciary duties by McGann and PPI. ¶57.

Under this "new" Letter Agreement drafted by Mr. McGann, the HLA would

"immediately terminate" and the Harolds would lose all rights under the HLA, including the right to collect royalties on net sales.  Cmplt. Exh. H.  Moreover, Mr. McGann provided that Mrs. Harold "release[] and forever discharge[]" Mr. McGann, PPI and any successor-in-interest to the Patent such as S&M NuTec from "any and all" liability, "**whether known or unknown**, on account of or in any way growing out of or in connection with the [Harold] Letter Agreement."[7]  Id. (Emphasis supplied). This proposed release was nothing short of a surreptitious attempt by McGann and PPI to hold themselves harmless from their own continuing conspiracy to defraud.  Mr. McGann signed this "new" Letter Agreement and again identified himself as a Doctor of Jurisprudence, as well as a Ph.D. and President and CEO of PPI.  Id.

While Mr. McGann acknowledged in his cover letter that "the current agreement between us calls for payment on sales of product," he suggested that Mrs. Harold counter-sign the "new" Letter Agreement so that she could be "treat[ed] ... like a shareholder of our company." Id. As a

---

[7]To effect their fraudulent scheme and further abuse the relationship between the parties, the proposed new agreement sent by defendants McGann and PPI on March 3, 2005 stated, *inter alia*, as follows:

> The parties hereto agree that, effective upon the Closing, (i) neither McGann nor the Company [PPI], nor any third party (including the purchaser of the Copmany's business and the above-referenced patent) shall have any obligation or liabilty under the Letter Agreement, (ii) the letter Agreement shall immediately terminate and be of no further force or effect, (iii) each of Harold, McGann and the Company releases and forever discharges each other party hereto and its respective officers, directors, and agents from any and all lawsuits, liabilities, actions, causes of action, claims, demands, damages, costs and debts of whatever kind whatsoever, whether known or unknown, on account of or in any way growing out of or in connection with the Letter Agreement or the subject matter thereof, and (iv) Harold shall be entitled to receive consideration as provided in Section 3 hereof.

Cmplt. Exh. H.

shareholder, Mr. McGann promised that "she would be paid next week" $14,630.00 after the closing with S&M NuTec based upon the percentage of dividends to which she would be entitled.  Id. Mr. McGann, however, continued to conceal from the Harolds the fact that over $40,000.00 in royalties were already due and owing and that PPI had generated over $800,000.00 in net sales in 2004.[8]  Further, Mr. McGann's letter postured McGann as a good Samaritan by going above and beyond that which was required under the HLA: "Though I sent her [Dorothy Harold] $1,500 over this period, it has actually gone the other way with my wife and I contributing approximately $250,000 to the Company and a mortgage on our house to secure the line of credit with our bank."[9]

> As we discussed by telephone I am faxing this letter along with some information regarding the sale of the assets of Pill Pockets, Inc. to S&M NuTec, LLC makers of Greenies brand dog treats.  As you can see, the president of S&M NuTec made a very persuasive case as to why we should hook our wagon to what they have already built.

---

[8]This concealment is in contradistinction to the policy of "open[ness]" Mr. McGann and PPI followed with S&M NuTec when they "openly provided" PPI's "financials, pro forma and other information." Cmplt. Exh. H.

[9]That he was acting as a good Samaritan or otherwise a "starving artist" as he portrayed himself, is belied by the fact that Mr. McGann has been employed as an associate practicing "general corporate litigation matters" with the law firm of Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP, since "September 2001 upon graduation from" law school.  Plaintiff has recently discovered this matter from the web site of Smith, Anderson, as that was the law firm identified as the preparer of the P.S.P.A.   Smith, Anderson is the "largest law firm in Raleigh and the Research Triangle region of North Carolina and one of the largest in the state" of North Carolina "provid[ing] a full range of legal services ... [to] clients includ[ing] some of the largest financial institutions, insurance companies, public utilities, retailers, manufacturing, pharmaceutical, and biotechnology companies in our region and the nation, as well as emerging growth and technology companies."  See Exh. B hereto, which Plaintiff's counsel just discovered.  To the extent this Court finds these facts material to the disposition of the Motions to Dismiss but  cannot consider these documents, Plaintiff requests leave to replead the facts contained in the documents.

As for your mom and her part in the process, it is my intention with this new agreement attached that she be able to take part in the payment stream for the full 13 years of the S&M NuTec agreement (if necessary), instead of her payments terminating at the expiration of claims of the Harold patent in May of 2008.  More importantly, the current agreement between us calls for payment on sales of product, while the attached, proposed agreement will treat her like a shareholder of our company and pay her also on the closing process of the sale of Pill Pockets as a company which includes other patents, equipment, and trademarks.  When I decided not to sell this product on my own and formed Pill Pockets with the investors from Colorado, I told your mom that I would pay her 5% of any dividends I received up to her maximum.  Though I sent her $1,500 over this period, it has actually gone the other way with my wife and I contributing approximately $250,000 to the Company and a mortgage on our house to secure the line of credit with our bank.  What I have had the board of Pill Pockets approve, is to take the agreement I have personally with your mom, and make it a company obligation to be paid at each distribution of proceeds of the shareholders of Pill Pockets.  Since I control 41.84% of Pill Pockets, your mom's 5% share of my holdings translates into 2.09% of the total to the shareholders up to the cap of $100,000.

Arguably, the wording of our original letter agreement would call for this obligation to transfer to S&M NuTec since the Harold patent is one of the assets being sold.  I believe this may be irrelevant since this new agreement limits the risk of less than a full payout since we have extended the period your mom could be paid from 3 years to 13, as well as made her a part of the closing proceeds and not just sales of product.  For example, she will be paid 2.09% of the initial distribution to shareholders which we anticipate will be $700,000.  Your mom's share would therefore be $14,630 and would be paid next week.  In addition to this, without selling the first dollar of product, we have an addition $2 million to be paid over the next two years for the assets of the company where, again, your mom will receive 2.09% or $41,800.  These payments are guaranteed by S&M NuTec whether the company ever sells any product.   Of course we know they will, and the distributions to the shareholders will be made quarterly beginning this summer.  Your mom will be entitled to receive 2.09% of the amount of these distributions as well until she reaches the full $100,000.

I would like to answer any questions you might have so I will call you later today or tomorrow.  We would like to get a signature prior to closing on Monday so we don't hold up any distributions or the sale itself.  I know this is all happening quickly, but we have had to treat this all as confidential.

Cmplt. Exh. H.

From Thursday March 3, 2005 (when the proposed new agreement was faxed to Robert

William Harold for presentation to his mother Dorothy Harold) through Monday March 7, 2005,

Mr. McGann called the Harolds and left numerous messages in an attempt to pressure Mrs.

Harold to execute the new agreement prior to the closing scheduled for Monday March 7, 2005.

¶59.  Mrs. Harold did not execute the proposed new agreement.  ¶60.

 The transaction between PPI and S&M NuTec closed on March 7, 2005, presumably with

S&M NuTec having completed its due diligence.  Mr. McGann and PPI received a minimum of

$2,000,000.00 at closing.  ¶61.  Mr. McGann and PPI, in apparent furtherance of their scheme to

defraud, failed to ensure that appropriate documents were executed to guarantee that the HLA

would survive the sale of the Patent to S&M NuTec as called for in the HLA.  ¶62.  This

violation was confirmed by the Closing Documents which provide that:

> Letter Agreement by and between Pill Pockets, Inc. and Mrs. Robert G. Harold[10]
> regarding Letter Agreement by and between Brian A. McGann and Mr. Robert G.
> Harold.  These agreements are Retained Liabilities and will not be assumed by
> S&M Nutec.

Exh. C.  Moreover, based upon the records PPI and McGann "openly provided" S&M NuTec, as

well as the right of S&M NuTec to conduct further due diligence under the Non Binding Letter

of Intent, S&M Nu-Tec knew, or should have known, through the exercise of appropriate due

diligence that Mr. McGann and PPI  had abused their relationship with Plaintiff and were in

material breach of the HLA. ¶67.

 Although Mrs. Harold had affirmatively declined to participate in PPI's activities as a

---

[10]The Closing Documents were provided by Defense counsel to Plaintiff's counsel on
May, 17, 2005.  Despite demand that the referenced "Letter Agreement by and between Pill
Pockets, Inc. and Mrs. Robert G. Harold" be produced Defense Counsel refused.  Exh. D.  As no
such Letter Agreement was ever signed by Mrs. Robert G. Harold, if this Court believes that this
is material to the instant motion, leave to replead this fact is requested.

shareholder by refusing to sign Mr. McGann's new letter agreement, PPI and McGann, in furtherance of their scheme to defraud the Harolds and convert their property, appear to have "treat[ed] her like a shareholder" in spite of her refusal.  In this regard, PPI and McGann identified Mrs. Harold as a "shareholder" in corporate documents prepared for execution on the day of closing.  Specifically, on the same day as closing with S&M NuTec, shareholders of PPI, (now know as PPI Pet Products, Inc.)executed a Shareholders Agreement and Related Documents.  Schedule 2 thereof was titled:

**Distribution of Closing Payment**

PILL POCKETS INC.
SCHEDULE OF DISTRIBUTION TO SHAREHOLDERS

Exh. E.  Unbeknownst to the Harolds, Mrs. Harolds was identified on this list shareholders as "Harold Royalty at 2.09%" and next to the Harold name PPI and McGann identified her distribution of "closing payment" to be $15,026.  This amount, however was far less than was actually past due the Harolds, which past due amount, based upon their entitlement to a 5% royalty, exceeded $40,000.  Moreover, consistent with PPI and McGann's prior practice of refusing to pay royalties, and in furtherance of PPI and McGann's scheme to defraud, they have not forwarded this distribution to Mrs. Harold, nor did they even apprise her of its existence prior to her retaining counsel and rescinding the HLA on March 18, 2005.

On March 18, 2005, counsel on behalf of the Harolds rescinded the HLA and tendered and returned the $1,500 previously paid by McGann and Harold, believing this to be the total amount of payments received by Robert George Harold and the Harolds.  ¶66.  Thereafter, counsel for McGann and PPI advised that $2,000 in total had been paid since 1997. Accordingly, on March 31, the balance of $500.00 was sent via Federal Express by counsel for the Harolds to

20

counsel for McGann and PPI for the purpose of tendering and returning any and all monies purportedly received by the Harolds under the HLA.  The Harolds have never received any other benefit pursuant to the HLA. ¶66.

On March 24, 2005, after Plaintiff's rescission letter was received, Mark A. Watkins, Esquire wrote to Plaintiff's counsel on behalf of  Mr. McGann and PPI.  Exh. F.  In this letter, Mr. Watkins acknowledged that the original terms of the HLA were never altered by agreement of the parties. This is in contradistinction to the unsupported statement in the McGann Memorandum of Law (p. 6) that at some time after Mr. Harold's death, "McGann and Plaintiff agreed to convert the method of payment under the Harold/McGann Contract from a royalty on sales to a royalty on dividends for the investment of seed capital to build and fund the business." Specifically, Mr. Watkins wrote that:

> Dr. McGann did approach the Harold family in early March 2005, with an alternative business proposal, which they have since rejected.  Thus, the proposal has not altered the terms of the **original agreement**.

(Emphasis supplied).

Despite this acknowledgment, Mr. Watkins conceded that no monies were reserved or segregated from net sales to make payment to the Harolds.  Instead, all sales monies were presumably used as "seed capital."  In this regard, Mr. Watkins claimed that his firm was holding in escrow in excess of $40,000 for the benefit of the Harolds provided they agree to execute a release.  Payment of these funds, however was only made "possible" by the closing with S&M NuTec: "As you are well aware, the transaction with S&M NuTec was only recently completed making the payment, now held in escrow possible."  This statement is extraordinary at least in that there had been sales and revenues resulting therefrom for the preceding 1 ½ years, and from

21

such revenue timely royalty payments should have been paid.  In point of fact though, there was

no reason, other than Defendants' conversion of the royalties due, as why prompt and proper

payment of the royalties were not "possible."   Moreover, any hint that PPI and McCann ever

intended to pay royalties on net sales is belied by the Schedule of Distribution from the S&M

Nutec sale prepared on March 7, 2005.

Despite Mr. Watkins' statement on March 24, 2005 that monies in excess $40,000 were

present in his firm's escrow account for the benefit of the Harolds, a Trust Table Report

identified that the funds were not placed in escrow until the next day on March 25, 2005.  Exh G.

This Table further identifies this transaction as:

> Proceeds form sale of company held in Trust for client (Harold) - do not release
> until instructed by MAW[11]

Moreover, this notation belies any true escrow account.  There was no escrow agreement. There

was no agreed upon escrow agent.  And, there was no reason for any escrow, as the funds

purportedly deposited should have been previously paid over at least the prior 1 ½ years when,

instead, Defendants were converting the funds for their own use as "seed capital."  Memorandum

of Law at 6.  The condition that the funds were not to be released "until instructed by MAW"

(presumably Mark A. Watkins) also makes deposited upon the whim of Mr. Watkins.  Moreover,

it is baffling as to why the notation of "held in Trust for **client** (Harold)" was made.  (Emphasis

supplied).  The Harolds were never Mr. Watkins' client and, indeed, as of March 25, 2005, was

known by Mr. Watkins to be adverse to Mr. Watkins' clients - Mr. McGann and PPI.

On March 28, 2005, Mr. Watkins associate Ross Babbitt corresponded again with

---

[11]Presumably MAW is Mark A. Watkins.

22

Plaintiff's counsel.  McGann Exh. B.  This time, Mr. Babbit conceded that sales numbers had not

previously been reported: "Reporting sales was understood not to be necessary..."[12]  With regard

to the monies in "escrow," Mr. Babbitt stated:

> Concerning your request for clarification on the amounts being held in escrow,
> please be advised that my office is holding in escrow $41,514 which represents
> 5% of sales (through December 31, 2004) of the product covered by the valid
> claims of the Harold patent.  Sales of the product did not begin until October of
> 2003.  Royalties for the six months ended June 30, 2004 total $15,327, the
> approximate amount Mr. McGann has been trying to give your clients for some
> time now.  Sales for the six months ending December 31, 2004 will not be
> finalized until March 31, 2005, but royalties for these sales will be $26,331.
> These fund are, and have been, held in this firm's escrow account.  We are
> prepared to release these funds immediately but only after the allegations set forth
> inn your letter have been withdrawn.  You will continue to receive payments
> semi-annually on sales made until the full value of the Agreement has been
> reached.

Finally Mr.  Babbitt confirmed that S&M NuTec was advised of the Plaintiff's rescission of the

HLA and the Harolds' "claim to ownership of the patent."


**ARGUMENT**

**1.     Defendants Brian McGann and PPI's Payment and Reporting Obligations Were
       Not Suspended Pending the Appointment of a Personal Representative for the
       Estate of Plaintiff's Decedent On March 31, 2005**

Mr. McGann and PPI principally contend that they have not breached any legal duty to

the Estate because there was no one to whom royalty payments could be made prior to the

appointment of Robert George Harold as the Estate's Personal Representative on March 31,

2005.

---

[12]Again plaintiff accepts this limited admission but disputes Mr. Babbits' statement that
that this understanding was "based on conversations with Robert W. Harold, and reiterated to
Mrs. Harold by Dr. McGann in written correspondence."

> The Complaint is premised on the faulty assumption that after the death of Harold, royalties due under the Harold/McGann Contract should be made to *any* family member and that *any* family member has the right to accept such payments on behalf of the estate. The law does not, however, support Plaintiff's assertions.
>
> \*   \*   \*
>
> Because there was no legal entity or person to which McGann could rightfully make the payment of royalties until March 31, 2005, McGann and PPI could not have breached any obligation to make payments under the terms of the Harold/McGann Contract because payments could not be paid until a personal representative had been appointed for the Harold estate. By the time the estate had been filed on March 31, 2005, current royalties for the period had already paid or were in escrow for the benefit of the Harold Estate.

McGann Memorandum of Law at 13-14.  In other words, Defendants claim that any obligation they owed was suspended and obviated until an estate was raised, and therefore shame upon the Harolds for not having raised an estate sooner.  This argument, however, comes with poor grace given the record reflecting that after Mr. Harold passed away, Defendant McGann in an apparent effort to lull and defraud the Harolds agreed to make payments and account directly to Dorothy Harold, the decedent's widow, to whom Mr. McGann elected to deal with either as a surrogate for the Estate or otherwise.  The Harolds relied upon this agreement for a substantial period of time and, accordingly, it is reasonable to infer that as a result of this reliance they did not cause the official appointment of a Personal Representative until March 31, 2005.[13]  Accordingly, Defendants are equitably estopped from changing their position at this time.

In Chemical Bank v. Dippolito, 897 F. Supp. 221, 224 (E.D. Pa. 1995) (Joyner, J.), the District Court found that Pennsylvania applies the Doctrine of Equitable Estoppel to "prevent a person from taking a position that is inconsistent with a position previously taken or acting

---

[13]To the extent the Court does not believe this is a reasonable inferences for the purposes of Rule 12(b)(6), Plaintiff requests leave to amend the complaint to make an affirmative allegation of same.

24

differently than the manner in which that person induced another person by word or deed to expect."  The elements necessary to invoke this estoppel are "(1) an inducement, whether by act, representation, or silence when one ought to speak, that causes one to believe the existence of certain facts; (2) justifiable reliance on that inducement; and (3) prejudice to the one who relies if the inducer is permitted to deny the existence of such facts."  See also, Precision Door Co. v. Meridian Mut. Ins. Co., 353 F. Supp. 2d 543, 559-560 (E.D. Pa. 2005)(Brody, J.).

In this case, after Mr. Harold died, both his widow and his son contacted Mr. McGann who was by then a lawyer and was representing himself at least in writing as a Doctor of Jurisprudence.  During these conversations, Mr. McGann assured the Harolds that despite the passing of Mr. Harold, he "would honor the contract."  Cmplt at ¶31-32.  This promise was later memorialized in the Disclosure Schedule attached as Exhibit D to PPI's PSPA: "Though Harold has since passed away, McGann will make payment directly to his spouse."[14]  In purported compliance with this agreement, Mr. McGann and PPI wrote to Dorothy Harold on January 15, 2005 and enclosed a check for $1,000 payable to her as "Payment of Royalties on Equity Received by B. McGann."  Mr. McGann and PPI further induced Mrs. Harold to deal directly with them by stating in their letter addressed to Mrs. Harold:

•      "I wanted to give **you** an update on the progress that Pill Pockets is making"

•      "the agreement between **us** remains my personal obligation"

•      "I am happy to send **you** that portion of any dividends or equity I receive up to the stated maximum"

•      "I am enclosing **your** first check"

---

[14]This document was provided by Defense counsel to Plaintiff's counsel on or about May 17, 2005 after the Complaint was filed.

- "I will also be reporting to **you** on a quarterly basis instead of twice of year"

- "This will keep **you** better informed of the happenings of the company"

(Emphasis supplied).

Again the second check sent on September 14, 2004 for $500.00 was made payable to

Mrs. Harold.  Mr. McGann and PPI further induced Mrs. Harold to deal directly with them by

stating in their letter addressed to Mrs. Harold:

- "I wanted to update **you** on the progress of Pill Pockets"

- "As **you** can see, we are nearing the point where we will be a profitable company with a broad product line"

- "I am also enclosing a check for $500 for **you**"

- "checks to **you** will become more regular."

Cmplt. Exh. G. (Emphasis supplied).

In their letter dated March 3, 2005, Mr. McGann and PPI again made the following

representations:

- "As for your **mom** and **her** part in the process, it is my intention with this new agreement attached that **she** be able to take part in the payment stream for the full 13 years of the S&M NuTec agreement (if necessary), instead of **her** payments terminating at the expiration of claims of the Harold patent in May of 2008."

- "the current agreement between **us** calls for payment on sales of product, while the attached, proposed agreement will treat **her** like a shareholder of our company and pay **her** also on the closing process of the sale of Pill Pockets as a company which includes other patents, equipment, and trademarks."

- "I told your **mom** that I would pay her 5% of any dividends I received up to her maximum.  Though I sent **her** $1,500 over this period, it has actually gone the other way with my wife and I contributing approximately $250,000 to the Company and a mortgage on our house to secure the line of credit with our bank."

- "What I have had the board of Pill Pockets approve, is to take the agreement I have personally with your **mom**, and make it a company obligation to be paid at each

26

distribution of proceeds of the shareholders of Pill Pockets.  Since I control 41.84% of Pill Pockets, your **mom's 5% share** of my holdings translates into 2.09% of the total to the shareholders up to the cap of $100,000."

• "we have extended the period your **mom** could be paid from 3 years to 13, as well as made **her** a part of the closing proceeds and not just sales of product."

• "**she** will be paid 2.09% of the initial distribution to shareholders"

• "Your **mom's share** would therefore be $14,630"

• "your **mom** will receive 2.09%"

• "Your **mom** will be entitled to receive 2.09% of the amount of these distributions as well until **she** reaches the full $100,000."

Cmplt. Exh. H.  (Emphasis supplied).

These statements reflect that Mr. McGann and Pill Pockets were in fact dealing with and making payments to Mrs. Harold as a surrogate for the Estate, and that there was an agreement to do so.  As a result of Defendants' course of conduct, the Harolds were induced not to raise an estate and appoint a personal representative prior to March 31, 2005 and the Defendants are equitably estopped form taking a legal position that they were excused form paying royalties because no estate had been raised.

Moreover, McGann and PPI concede that under "exceptional circumstances," an heir has "the right" to "collect debts due the estate."  McGann Memorandum of Law at 13.  In this regard, the Pennsylvania Supreme Court held that where there are no debts to be paid and no distribution needed, a personal representative need not be appointed to maintain actions for trespass, trover or "account render" of estate property.

While it is true that administration is the legally-appointed channel through which an absolute title to personal property of an intestate is acquired, it is equally true that the property of such intestate passes at his death to those legally entitled to the succession, subject to the claims of creditors and the laws in force for

27

administering it; but, if there be no debts to pay and no distribution needed, administration is not indispensable to that dominion over the property which is necessary to maintain trespass, trover, or an action of account render.

Roberts v. Messinger, 134 Pa. 298, 309-310, 19 A. 625, 625 (Pa. 1890).  This holding is

consistent with the provisions 20 Pa.C.S.A. 301(a) delineating to whom legal title to the personal

estate passes upon a decedent's demise: "Legal title to all personal estate of a decedent shall pass

at his death to his personal representative, **if any**, as of the date of his death."  (Emphasis

supplied).  Thus, as the Superior Court explained in Brothers Estates,

> [Appellant's] basic premise is that title to personal property of an intestate vests in his administrator, and she takes the novel stand that the rights of an heir to a distributive share are fixed as of the time of distribution and not of the time of the intestate's death.

> The contention is patently unsound.  The rights of distributees of the personal property of an intestate vest immediately upon his death, subject only to the satisfaction of debts and charges, and administration according to law. If an administrator is appointed, he holds the legal title, but in trust for the purpose of administering the estate. The rights of the distributees are fixed at the instant of death. This is the clear and undeviating doctrine of all our cases.

156 Pa. Super. 292, 294-295, 40 A.2d 156, 157 (Pa. Super. 1944).  In this case there is no

evidence in the record that the Estate had any creditors, nor is there any dispute among the

intestate heirs, Mr. Harold's widow and their two children.  To the extent this Court requires

these matters to be affirmatively pled, Plaintiff is in a position to so plead upon information and

belief.

**2.     Defendants McGann and PPI Violated Their Duty to Plaintiff by Completely Failing to Make "Appropriate and Reasonable" Royalty Payments under the Agreement of Sale.**

Defendants McGann and PPI ask this Court to dismiss Count II (Breach of Contract -

Rescission - Avoidance) because as "royalties (sic) payments were made consistent with the

28

terms of the Harold/McGann Contract, there could be no breach of failure to pay royalties." McGann Memorandum of Law at 16.  Defendants argue that because"McGann made appropriate and reasonable payments under the terms of the Harold/McGann Contract," they breached no legal duty.  McGann Memorandum of Law at 14.  The record, however, supports Plaintiff's allegations, and indeed a jury could well find that no "royalty" payments were made under "the terms of the Harold/McGann Contract."

The purchase price for the Patent under the HLA included an initial payment of $500.00[15] as well as "a royalty of 5% on net sales of products covered by the claims of the patent, up to a total cap of $100,000.00 in cumulative royalty payments."  Only two payments totaling $1,500 were made after the initial $500.00 payment in May 1997, and neither payment was on account of a royalty payment due under the terms of the HLA.  Instead, the first check for $1,000.00 was characterized by Mr. McGann and PPI as representing "5% of the proceeds received in the merger with the Colorado company."  Similarly, the second and last check for $500.00 was characterized by McGann and PPI as a mere "Advance on Royalty Payments" because Mr. McGann was "not taking a salary and we have yet to reach break-even."  Cmplt. Exh. G.

In truth and in fact, however, no "**Advance**" on royalty payments needed to be made as

---

[15]To artificially inflate the amount of "royalties" they claim to have paid, Defendants now mis-characterize this payment as "$500 in advance royalties were paid to Harold in 1997." This characterization, however, is unsupported by the terms of the HLA which makes this payment unconditional and unrelated to any future net sales.  Rather, the check accompanied the partially executed HLA Mr. McGann sent to Mr. Harold in May 1997.  The HLA provided: "By signing below, and acknowledging the receipt and acceptance of the enclosed $500.00, you hereby sell and assign the above patent under the following terms of sale."  The HLA further references this payment of $500.00, simply stating "Bryan McGann will pay Bob Harold the sum of $500.00." A royalty, on the other hand, is "compensation for the use of property ... expressed as a percentage of receipts from using the property or as an account per unit produced."  Black's Law Dictionary (6th Ed. 1990).

Mr. McGann and PPI had already realized substantial sales which should have generated royalty payments well in excess of the $500.00 sent in September 2004 and the $1,000 sent the prior January 2004.  (Emphasis supplied).  Indeed, net sales of products covered by the Patent exceeded $35,000.00 in the second half of 2003 (upon which the 5% royalty would exceed $1,800.00) and exceeded $300,000.00 in the first half of 2004 (upon which the 5% royalty would exceed an additional $15,000.00).  Instead of paying these monies to Dorothy Harold, Defendants McGann and PPI pocketed same, without disclosure to the Harolds, to use as an "investment of seed capital to build and fund the business."  McGann Memorandum of Law at 6.  All the while though, Mr. McGann and PPI continued to reiterate, as late as March 3, 2005, that "current agreement between us calls for payment on sales of product," as well as offer assurance in September 2004 that "checks to you will become more regular."  However, although net sales in the second half of 2004 exceeded $500,000 (upon which the 5% royalty would exceed 25,000.00) no further payments were made.

Moreover, since 1997 and during the time they were withholding and misappropriating Plaintiff's royalty monies, Defendants McGann and PPI were well aware that the Harolds were in "pain" and "having tough days."  As described by Mr. and Mrs. Harold in their email to Mr. McGann on July 13, 2002, just before Mr. Harold's death, he and Mrs. Harold were under "EXTREME" mental, physical and financial "stress."

> Dot and I were so happy to receive your letter, actually we were thrilled to death as this was the first piece of good news in our life for a long long time.
>
> I was glad to here (sic) you received your law degree and both Dot and I were especially glad to here (sic) about your four year old son as we are blessed with four grandchildren, ages two to ten.  I'm so sorry I haven't written you sooner but my wife and I have been under EXTREME stress for many months.  My wife's mother started with alzheimers disease last year.  She had been living alone in her

30

own home for the past 25 years and we would help her whenever she needed it, Pay her bills, see to her medicines, doctors visits, etc. Over the past several months her health deteriorated and we became nursing aides on a daily basis. Finally we had to place her in a assisted living facility as it became Overwhelming for us. Now my mother-in-law had no money except for her home valued at 100K. All of a sudden out of the woodwork my in-laws (Dot's brother and sister-in-law) show up. They only came around once or twice a year to visit even though they only lived 80 miles away. Now they have her sign over and sell her home, get power of attorney and move her close to where they live.

We couldn't contest anything as unfortunately I lost mostly all of my retirement and savings over the past few years as three of my investment companies went bankrupt. Along with all of this my step father is in a rehab facility recovering from a stroke. Now my mother is by herself and wants me to come see her more often as she is afraid to live alone. She lives seventy miles away in New Jersey. Well as you might have guessed my migraines are much worse causing me to seek medical attention weekly. (Narcotic injections) Unfortunately none of the new migraine medications help me...Now I'm really sure you understand how happy Dot and I were after hearing from you.

Good luck at the show and thanks for your persistence.

By mis-characterizing the payments and failing to properly account for the net sales

Defendants McGann and PPI materially and deliberately misled the Harolds and concealed from

them material information which they had a duty to disclose including, but not limited to, the

fact that funds due the Harolds were not being paid but instead were being converted by

Defendants McGann and PPI for their own use in violation of the Agreement of Sale.

Specifically, McGann and PPI wrote the Harolds that:

• "the agreement between us remains my personal obligation" January 15, 2004.

• "As you can see, we are nearing the point where we will be a profitable company....  I am enclosing a check for $500 for you.  Even though I am not taking a salary and we have yet to reach break-even, I believe that will change soon and I will regularly receive salary and dividends and checks to you will become more regular."  September 14, 2004.

• "Though I sent her [Dorothy Harold]  $1,500 over this period, it has actually gone the other way with my wife and I contributing approximately $250,000 to the Company and a mortgage on our house to secure the line of credit with our bank." March 3, 2005.

In addition to these written representations, from 2002 through early 2005, Robert William Harold would periodically call Mr. McGann to ask for updates.  At no point did Mr. McGann inform Robert William Harold of the net sales of product.  Instead, Mr. McGann told Robert William Harold on one or more occasions that no money was being made and that Mr. McGann was not even taking a salary.   Upon information and belief, Mr. McGann and PPI's statements, mis-characterizations and failures to report net sales were part of a conspiracy to convert Plaintiff's property (including the royalty payments already due and owing) to their own use and to defraud the Harolds by such means and by creating the false impression that products covered by the Patent were not generating significant sales.  Accordingly, Plaintiff has averred more than sufficient facts to contest Defendants bare claim that "McGann made appropriate and reasonable payments under the terms of the Harold/McGann Contract."

Defendants also argue that because "The Harold/McGann Contract is silent on the timing of royalty payments. It, therefore, did not impose any duty upon McGann to provide royalty payments at specified times."  McGann Memorandum of Law at 15.  Accordingly, Defendants argue that they "adopted a reasonable course of performance such that royalties were paid on an annual basis after yearly accounting records were complete (i.e., 90 days after year end)."  Id. This position was clearly invented after the fact and most notably after Plaintiff gave notice of its decision to rescind.

In this regard, the HLA required at least semi-annual payments.  Why else would the parties have provided for semi-annual accountings, if they were not to be accompanied by semi-annual payments?  Once the accounting is reported, there is no legitimate impediment or reason not to make payment.  The royalties are earned when the sales are made and they belong to the

32

Harolds. As there is no other proper use of the monies, the accounting should trigger payment.

That the parties were waiting for year end is further belied by the actual payment history. The first payment was made on January 14, 2004, 76 days before the "90 days after year end" Defendants now suggest is the time for payment.  Moreover, Mr. McGann promised to increase his required accountings from semi-annually to quarterly.  Despite this commitment, his next payment was made in September 2004, almost seven months before Defendants claim the next payment would have been due on March 31, 2005 under the Defendants' theory.  Indeed in his letter accompanying the September payment, Mr. McGann assured Mrs. Harold that payments would become "more regular."  Thereafter, in March 2004, instead of offering the annual royalty payment, as is now suggested would have been appropriate, Mr. McGann offered to pay Mrs. Harold a dividend in the amount of $14,630.00 provided she sign a release and agree to cancel the HLA.  Only after plaintiff rescinded the HLA on March 18, 2004, did Defendants claim to escrow monies to pay royalties on net sales.  That this was an afterthought is made clear by the fact that no monies were reserved or segregated from the company's net sales to make the royalty payments, and that monies "escrowed" on March 25, 2005 were only available from proceeds of the sale to S&M NuTec.

Moreover, at the time Defendants received the S&M NuTec proceeds on March 7, 2005, they purported to schedule a distribution of $15,026.00 to Mrs. Harold as a "shareholder," however, they never paid this "distribution" to their "shareholder" nor did they inform the Harolds that such distribution was scheduled.  No doubt, had the sale never taken place, Defendants would now claim that payment would be due at some time other than 90 days after year end.  Accordingly, this argument must be rejected.

33

3.     **Defendants Breached the HLA By Completely Failing to Report on Net Sales Prior to the Rescission of the HLA on March 18, 2005**

Defendants McGann and PPI argue as a matter of fact that semi-annual reports were made on net sales.  This claim is ludicrous.  There is no mention in any of the alleged "reports" of net sales.  To the contrary, although sales were being made at least beginning in 2003 through 2005, Mr. McGann never made mention of net sales in the correspondence during this time frame.  Moreover, during his "periodic" conversations with Robert William Harold through 2005, at no point did Mr. McGann inform him of any net sales of product.  Instead, Mr. McGann deceptively informed Robert William Harold on one or more occasions that no money was being made and that he was not even taking a salary.

As for the period prior to 2003, there is no evidence of record that sales were made.  Moreover, even assuming sales were not being made, Mr. Harold was under an obligation to report on same.  Otherwise, Mr. Harold not make an intelligent decision whether to exercise his right to exchange his rights to royalties for a lump sum payment of $3,000.00 as provided in the HLA.  If sales were zero, Mr. McGann should have just reported same.

4.     **Defendants McGann and PPI Breached the HLA by Reselling the Patent Without Providing That the Obligations under the HLA Would Survive the Sale and Become the Responsibility of the New Owner**

Again, ignoring the facts of record, Defendants claim that they did not violate the HLA by transferring the Patent without providing that the new owners would maintain the obligations under the HLA including, most importantly, the obligation to pay royalties on net sales.  The evidence is rather clear that both Mr. McGann and PPI failed to live up to this obligation.  First, the PPI Preferred Stock Purchase Agreement specifically provides that the obligation to make

34

royalty payments and report were not be transferred to PPI when Mr. McGann initially

transferred the patent.  Thereafter, when the Patent was transferred to S&M NuTec, the Closing

Documents made clear that the obligation under the HLA would remain with Mr. McGann.  As

has been made rather clear, the Harolds did not agree to this sale with this provision.

Accordingly, Defendants argument is without merit.


**5.      Defendants McGann and PPI Breached the HLA By Failing to Timely Develop, Market and Sell Product**

Plaintiff alleged in Paragraph 65(g) of the Complaint that Mr. McGann breached the

HLA and his legal duties by his "Failure to timely pursue the development, marketing and sales

of products under the patent." In this regard, Plaintiff avers that "defendant McGann undertook

to use best efforts and/or reasonable and/or timely efforts to market and produce the product to

be developed from the aforesaid patent so that plaintiff's decedent could receive up to $100,000

in sales royalties." Defendant McGann, however, asserts that Plaintiff's claim must fail "as a

matter of law" because the HLA is "silent."  Defendants argument is wrong both as a matter of

law and a matter of fact.

First, "as a matter of law," best efforts are implied when there has been a transfer of an

exclusive right.  Almost ninety years ago, Justice Cardozo addressed the issues of implied best

efforts in the context of contracts to exclusively deal in his landmark <u>Lady-Duff Gordon</u> opinion.

> It is true that he does not promise in so many words that he will use reasonable
> efforts to place the defendant's endorsements and market her designs. We think,
> however, that such a promise is fairly to be implied. The law has outgrown its
> primitive stage of formalism when the precise word was the sovereign talisman,
> and every slip was fatal. It takes a broader view to-day.  A promise may be
> lacking, and yet the whole writing may be "instinct with an obligation,"
> imperfectly expressed. If that is so, there is a contract.

35

> The implication of a promise here finds support in many circumstances. The defendant gave an exclusive privilege. She was to have no right for at least a year to place her own endorsements or market her own designs except through the agency of the plaintiff. The acceptance of the exclusive agency was an assumption of its duties.  We are not to suppose that one party was to be placed at the mercy of the other.

Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 90-91 (N.Y. 1917).  As the Third Circuit, citing

Lady-Duff Gordon explained, "Where an owner of a product gives an exclusive agency, solely in

return for royalties, but no promise is expressed on the part of the agent to use his best efforts to

promote it, the courts have implied such a promise." HML Corp. v. General Foods Corp., 365

F.2d 77, 80 (3d Cir., 1966) (applying New York law).  Pennsylvania, whose law informs the

contract at issue, follows Justice Cardozo.  See Maxwell v. Schaefer, 381 Pa. 13 (Pa. 1955).

> The fact that Maxwell did not, in express terms, promise to devote his best efforts to the sale of "Spritzit" did not mean that he was not bound contractually to do so....  In the instant case, Maxwell promised to forego distribution of products similar to "Spritzit" and, since his profits depended entirely on the volume of sales he was able to create for the product, it may fairly be inferred that all parties to the agreement fully intended and expected him to devote reasonable effort to the promotion of "Spritzit".

Maxwell, 381 Pa. at 18 (Pa. 1955), citing Wood v. Lucy, Lady-Duff Gordon, supra.  Similarly, in

Jamison v. Concepts Plus, Inc., 552 A.2d 265, 269-270 (Pa. Super. 1988), the Superior Court

found that when the benefits to one party of a contract are solely dependent upon the other

party's "effort to bring about the happening of the condition to his promise" this effort must be

made with "diligen[ce] anf good faith."  If these duties were not implied, the promise or

obligation would be illusory, and the other side would be left to the promisors "whim – 'I will if

I want to.'"

> The parties here intended a contract for the sale of real estate. The agreement was entered into with the understanding that both parties were firmly committed to the performance of the agreement provided that cooperation would be forthcoming

36

from the borough council. The buyer has wisely protected himself, with the seller's consent, against the possibility that he is unable to obtain the license. In so doing, however, Jamison has impliedly promised to make a diligent and good faith effort to bring about the happening of the condition to his promise. Following the general principles of contract law, we observe that if no duty is implied or imposed upon the buyer in this situation, there is no contract. The buyer's promise or obligation is illusory. If in fact Jamison was under no obligation initially to proceed with approval proceedings, then the language of the contract is rendered meaningless. Jamison would have bound himself to nothing, and performance would be left to his whim -- "I will if I want to." As one author has noted: "[T]he practice of making promises will lose much of its effectiveness in an economic order of co-operation and exchange if promises are to be performed only when it suits the promisor's convenience." Patterson, Constructive Conditions in Contracts 3 , 42 Colum.L.Rev. 903, 953 (1942).

* * *

In the case before us, the contract specifically stated that the "Buyer shall be responsible for obtaining all necessary approvals and permits for the subdivision of the subject premises . . . ." Under these circumstances, as in the analogous situation of a mortgage contingency clause, we find no significance in the absence of words such as "due diligence," "reasonable efforts," or "best efforts." The statement that "Buyer shall be responsible for obtaining all necessary approvals and permits for the subdivision" cannot reasonably be interpreted, as the trial court states, to mean that Buyer was "under no obligation" to do anything. We must hold the promisor to the reasonable meaning of his or her words in order to protect the needs of society and trade as well as the promisee's justified reliance upon a promise.

Jamison v. Concepts Plus, Inc., 552 A.2d 265, 269-270 (Pa. Super. 1988).  Similarly in Slater v.

Pearle Vision Center, Inc. the Superior Court found that "where it is clear that an obligation is

within the contemplation of the parties at the time of contracting or is necessary to carry out their

intentions, the court will imply it . . . even where the contract itself is not ambiguous."  376 Pa.

Super. 580, 546 A.2d 676, 679 (Pa. Super. 1988).

In the case of exclusive dealing, Judge Alito explained the reasons underlying the

imposition of a duty of best effort when compared to non-exclusive relationships.

In a non-exclusive arrangement the buyer's efforts in reselling the product may have little effect on the original seller. If the buyer does not resell the product, the

37

seller, without breaching the contract, may solicit orders from other potential buyers. By contrast, in an exclusive dealing arrangement the seller has only one outlet for its goods. It is obligated not to sell to anyone except the buyer. In such a situation, the seller's interests are inextricably bound up with the success of the buyer in reselling the product. <u>The obligation placed on the buyer to use best efforts reflects its monopoly power; the exclusivity arrangement makes the seller as subject to the decisions of the buyer as a subsidiary within the buyer's firm. The obligation of best efforts forces the buyer/reseller to consider the best interests of the seller and itself as if they were one firm.</u>

<u>Tigg Corp. v. Dow Corning Corp.</u>, 962 F.2d 1119, 1125 (3d Cir. 1992)(Emphasis supplied)(applying Michigan law, the Court found that "The obligation to use best efforts to resell a product is imposed upon those buyers engaged in 'exclusive dealing in the kind of goods concerned . . . .' This obligation is intended to protect the original seller, who in an exclusive arrangement depends solely upon the buyer to resell the goods.") <u>See also</u> <u>Huang v. BP Amoco Corp.</u>, 271 F.3d 560, 564-565 (3d Cir. 2001)(applying Pennsylvania law) ("Because of the implied covenant of good faith, an approvals contingency clause does not give a lessee an absolute right to terminate the lease without penalty. Rather, the lessee must make a diligent and good-faith effort to obtain the required approvals.").

Similarly, Pennsylvania has adopted the doctrine of necessary implication.  This doctrine provides that:

in the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

<u>Somers v. Somers</u>, 418 Pa. Super. 131, 137-38, 613 A.2d 1211, 1214 (Pa. Super. 1992); <u>see also</u> E.A. Farnsworth, Contracts § 7.17 at 527 (1982) ("A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the

38

performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.").

In this case, having bargained for the exclusive patent right and pledged to pay royalties based upon the net sales of products covered by the patent, Mr. McGann was obliged use his best efforts to bring products to market.

Moreover, the contract is not "silent" on the issue of best efforts and/or reasonable efforts, as Defendants claim.  The contract very clearly states that "In the event of unforeseen delays in the generation of sales, Bob Harold can exchange his royalty options for cash equal to $3,000.00 which is substantially equal to the patent sales price originally agreed upon between the parties."  This makes rather clear that at the time the agreement was signed, the parties foresaw no delays in generating sales, otherwise the parties would have referenced "foreseeable delays" instead of "unforeseen delays."  By matriculating to law school in 1998 and making no reasonable efforts commercialize the patent until at least 2002, instead of devoting his energies to generating sales, Mr. McGann breached the HLA.  Moreover, he then used this breach as a weapon against Mrs. Harold to have her sign a release in March 2005, when he explained that she should sign his new letter agreement making her a shareholder and releasing Mr. McGann because:

> As for your mom and her part in the process, it is my intention with this new agreement attached that she be able to take part in the payment stream for the full 13 years of the S&M NuTec agreement (if necessary), instead of her payments terminating at the expiration of claims of the Harold patent in May of 2008.

Cmplt Exh. H.  Had Mr. McGann not neglected his responsibilities under the HLA, Mrs. Harold would not have been faced with this dilemma.

**6.     Defendants McGann and PPI's Breaches Were Not Excused**

Defendants McGann and PPI claim that any breaches they committed were "excused by Plaintiff through waiver and/or modification."  McGann Memorandum of Law at 20. Defendants argue that "If Plaintiff thought he had the right to require more frequent payments or payments on a different time schedule, that right was not asserted and is now waived."  Id. at 22. This argument, however, assumes Plaintiff's knowing acquiescence, and, given the facts as pled in this case, is absurd.

First, the Harolds were never informed, and hence never had the opportunity to object that their royalties were being reinvested back into PPI as "seed capital."  Moreover, as pled in the complaint and discussed *ad nauseam* above, between 2002 and 2005 Mr. McGann informed Robert William Harold that"no money was being made" and he "was not even taking a salary" in an attempt to create the false impression that products covered by the Patent were not generating significant sales. Moreover, in his written communications he attempts to give the impression that there were no net sales by making a $500 payment towards an "Advance" on royalties, stating that:

> I am also enclosing a check for $500 for you. Even though I am not taking a
> salary and we have yet to reach break-even, I believe that will change soon and I
> will regularly receive salary and dividends and checks to you will become more
> regular.

Cmplt Exh. G.  Mr. McGann also promised both Mrs. Harold and Robert William Harold that he "would honor the contract."  Finally, in February 2003, it is stated in the PPI Preferred Stock Purchase Agreement that the obligation under the HLA would remain Mr. McGann's obligations, and then, as late as March 7, 2005, it is agreed in the asset purchase agreement with S&M NuTec that the HLA would remain as a  "Retained Liabilit[y]." Most importantly though,

Mr. Watkins, the lawyer for McGann and PPI, agreed that the original agreement had not been

"altered."  Accordingly, Defendants' argument must fail.  See Exh. F.

**7.**     **Plaintiff Has Pled Sufficient Facts to Establish a Claim for Rescission and Avoidance**

Pennsylvania law recognize multiple grounds for rescission.  Among the permissible

grounds are breach of fiduciary duty and/or confidential relationship, a material and substantial

breach, a wilful refusal to pay consideration, fraud in the inducement and repudiation of the

contract.  Plaintiff will address each of these grounds.

**a.**     **Rescission is Appropriate Because Defendants McGann and PPI Breached Their Fiduciary/Confidential Relationship With Plaintiff**

Defendants argue that rescission is only possible when there has been fraud.  This is not

the law of Pennsylvania.  In <u>Frowen v. Blank</u>, the Pennsylvania Supreme Court described the

availability of rescission in case where there has been a breach of a fiduciary/confidential

relationship.

> As previously noted, appellant argues in the alternative that the record establishes the existence of a confidential relationship between decedent and appellee. If a confidential relationship has been established on this record, our earlier finding that appellant had failed to affirmatively show fraud would not preclude appellant from some relief. <u>Rescinding a contract because of fraud calls into play one set of criteria; rescission based on the breach of a confidential relationship is another proposition.</u>
>
> <u>When the relationship between the parties to an agreement is one of trust and confidence,</u> the normal arm's length bargaining is not assumed, and overreaching by the dominant party for his benefit <u>permits the aggrieved party to rescind the transaction</u>. This is so because the presence of a confidential relationship negates

the assumption that each party is acting in his own best interest.  Once a confidential relationship is shown to have existed, it then becomes the obligation of the party attempting to enforce the terms of the agreement to establish that there has not been a breach of that trust.

We agree with Judge Spaeth in his dissent in Frowen II that if such a relationship did exist between the decedent and the appellee, finding that the decedent understood the terms of the agreement does not necessarily preclude a finding that the relationship had been breached. <u>Where a confidential relationship exists, the law presumes the transaction voidable</u>, unless the party seeking to sustain the validity of the transaction affirmatively demonstrates that it was fair under all of the circumstances and beyond the reach of suspicion.  The crux of the controversy presently before us is whether the record here establishes the existence of a confidential relationship.

<u>Frowen v. Blank</u>, 425 A.2d 412, 416 (Pa. 1981)(Emphasis supplied).  Similarly, to the extent

Plaintiff here has pled sufficient facts to establish a fiduciary and/or confidential relationship, his

claim for rescission must survive.

Under Pennsylvania law, "Fiduciary or confidential relationships arise when one party

places confidence in another with resulting superiority and influence on the other."  <u>Temp-Way</u>

<u>Corp v. Continental Bank</u>, 139 B.R. 299, 318 (E.D.Pa. 1992).  Thus, "[a] confidential relation

exists between two persons when one has gained the confidence of the other and purports to act

or advise with the other's interest in mind." <u>Frowen v. Blank</u>, 493 Pa. 137, 148, 425 A.2d 412,

418 (1981), <u>citing</u> the Restatement of Trusts 2d, § 2(b).  Further, in <u>Basile v. H&R Block</u>, the

Superior Court noted that:

Our Supreme Court has acknowledged that "the concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line." The Court has recognized, nonetheless, that "the essence of such a relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other." Accordingly, "[a confidential relationship] appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed[.]" The Supreme Court's use in

42

Frowen of the disjunctive "or" to separate the cognizable characteristics of confidential relation is critical. Contrary to the trial court's determination in this case, our law does not require both "overmastering influence and, . . . weakness, dependence or trust." Indeed, both elements need not appear together as "in both an unfair advantage is possible."

777 A.2d 95, 101 (Pa. Super. 2001). The Court further noted that:

disparity between the respective parties is to be adjudged subjectively, and may occur anywhere on a sliding scale of circumstances. Thus, in Frowen, the Court concluded that a confidential relationship existed between an elderly widow who sold her farm to a neighbor friend, not because the neighbor demonstrated any particular level of strength or business savvy, but because the widow demonstrated weakness and trust.

Id. at 102.

In this case, there is ample evidence to show both a demonstrated weakness and trust, as well as overmastering influence, sufficient to survive a motion to dismiss. First Plaintiff specifically pled in paragraphs 60 and 71 as follows:

69.    At all times relevant to this Complaint, defendants McGann and PPI were in a superior and dominant position to that of Robert George Harold and the Harolds whom they solicited to place complete trust in their decision making and exercise of discretion and good faith and to make appropriate accountings .
*    *    *
71.    At all relevant times, defendants McGann and PPI purported to act with respect to the interest of Robert George Harold and his Estate in a fiduciary and/or confidential capacity and caused Robert George Harold and the Harolds to trust and rely upon the defendants treating them him fairly and dealing with them at a non-arms length, good faith, fair dealing basis.

Additionally, the complaint and most importantly the exhibits thereto further reveal the following. In terms of demonstrated weakness the complaint establishes inter alia:

1.    The Harolds were completely dependent upon Mr. McGann and PPI to account for net sales, as they had no independent access to this financial information.

2.    At or around the time the HLA was executed, Mr. McGann knew and understood that Mr. and Mrs. Harold were in "pain" and "were having tough days." Cmplt. Exh. D.

43

3.      In July 2002 Mr. McGann knew and understood that:

- •      Mr. and Mrs. Harold were under "EXTREME stress"

- •      Mrs. Harold's mother "started with alzheimers disease last year. She had been living alone in her own home for the past 25 years and we would help her whenever she needed it, Pay her bills, see to her medicines, doctors visits, etc. Over the past several months her health deteriorated and we became nursing aides on a daily basis. Finally we had to place her in a assisted living facility as it became Overwhelming for us. Now my mother-in-law had no money except for her home valued at 100K. All of a sudden out of the woodwork my in-laws (Dot's brother and sister-in-law) show up. They only came around once or twice a year to visit even though they only lived 80 miles away. Now they have her sign over and sell her home, get power of attorney and move her close to where they live."

- •      Mr. and Mrs Harold had "lost mostly all of my retirement and savings over the past few years as three of my investment companies went bankrupt."

- •      Mr. Harold's "step father is in a rehab facility recovering from a stroke [and] ... my mother is by herself and wants me to come see her more often as she is afraid to live alone. She lives seventy miles away in New Jersey.

- •      Mr. Harold's "migraines are much worse causing me to seek medical attention weekly. (Narcotic injections)"

- •      "[n]one of the new migraine medications help" Mr. Harold.

As a result of these events, they explained to Mr. McGann in July 2002 "Now I'm really sure you understand how happy Dot and I were after hearing from you."

4.      Mrs. McGann became a widow on September 29, 2002.[16]

The following facts show demonstrated trust:

1.      Mr. Harold executed an agreement of sale and based receipt of his consideration upon the good faith and trust he reposed in Mr. Harold, as he would receive no royalty payment unless Mr. McGann worked diligently and made honest accountings as required under

---

[16]As noted above, to the extent the Court believes more facts concerning the Harold weakness would be material to its decision, Plaintiff requests leave to replead facts demonstrating, *inter alia*, the Harolds' lack of education, sophistication and business acumen, including their lack of understanding of the differences between terms used by Defendants including "royalties on dividends," "royalties on sales" and "royalt[y] on equity."

the agreement.

2.      At the time the HLA was presented to Mr. Harold for his signature, Mr. McGann represented that "[m]y attorney said that the letter format I had was fine for our purposes as long as it is backed up by the formal assignment and sale agreement for recording in the patent office."  Cmplt Exh. B.

3.      On March 14, 2002 Mr. McGann, identifying himself as a Doctor of Jurisprudence and an M.B.A., assured Mr. and Mrs Harold that he "never lost his desire to get Stow Away to market" and that he "w[ould]l keep [them] informed of all events as they unfold." Cmplt Exh. D.

4.      After Mr. Harold's passing, Mr. McGann assured both Mrs. Harold and Robert William Harold that  he "would honor the contract."

5.      During periodic phone calls from Robert William Harold to Mr. McGann between late 2002 through early 2005, Defendant McGann assured Robert William Harold that no money was being made and that was not even taking a salary.

6.      On January 15, 2004, signing as a Doctor of Jurisprudence, Mr. McGann assured Mrs. Harold that "the agreement between us remains my personal obligation" and that "I spoke with you son recently and told him that I will also be reporting to you on a quarterly basis instead of twice of year as called for in the agreement. This will keep you better informed of the happenings of the company....  I am truly excited about the possibilities **we** have to make this effort successful."

7.      On September 14, 2004, signing as a Doctor of Jurisprudence and a Ph.D., Mr. McGann established trust by claiming that the he was sending a $500 check as an advance on royalties "even though I m not taking a salary and we have yet to reach break-even" and promising that "checks will become more regular."

8.      On March 3, 2005, signing as a Doctor of Jurisprudence and a Ph.D. as well as President, Chairman and CEO of PPI, again attempted to establish trust by assuring the Harolds that they were his priority because "though I sent [Mrs. Harold] $1,500 over this period, it has actually gone the other way with my wife and I contributing approximately $250,000 to the Company and a mortgage on our house to secure the line of credit with our bank." He further assured them that the new agreement he was proposing that Mrs. Harold sign would

a. "limit [her] risk;"

b. "treat her like a shareholder;"

c. enable her "to take part in the payment stream for the full 13 years of the S&M NuTec

Agreement ... instead of her payments terminating at the expiration of the claims of the Harold patent in May of 2008;"

d. "make her part of the closing proceeds and not just sales of product;" and

e.  entitle her to "guaranteed" payments.

The following facts show Mr. McGann and PPI's overmastering influence.

1.    Mr. McGann and PPI were in the sole and exclusive possession of the net sales monies and held exclusive access to their financial information, such that Plaintiff were entirely dependent upon them to provide accurate and truthful accountings.

2.    Mr. McGann consistently held himself out as, alternatively, an M.B.A, a Doctor of Jurisprudence and a Ph.D.

3.    Mr. McGann understood the Harold's physical, emotional and financial weakness as well as their lack of sophistication and education.

4.    Mr. McGann was the dominant shareholder in PPI with 41.84% of the stock, as well as President, CEO and Chairman, such that he could control PPI's dealings vis-a-vis the Harolds. Cmplt Exh. H.

In assessing the sufficiency of these allegation, the Court should bear in mind that

Federal Court is a notice pleading jurisdiction and as such, Plaintiffs simply need to plead

enough facts to put Defendants on notice of their claim. "This simplified notice pleading

standard relies on liberal discovery rules and summary judgment motions to define disputed facts

and issues and to dispose of unmeritorious claims." Swierkiewicz, supra, 534 U.S. at 512.  See

McHale v. NuEnergy Group, 2002 U.S. Dist. LEXIS 3307, *24-26 (E.D.Pa. 2002)(refusing to

dismiss claim for breach of fiduciary for the purposes of a Rule 12(b)(6) motion and

"assum[ing]" that a fiduciary relationship exists for that purpose.")  Accordingly, because a

"confidential relationship ... is usually a question of fact in each case," in the context of a

demurrer under Federal Rule of Civil Procedure 12(b)(6), this Court would have to find that no

facts have been pled which could give rise to a confidential relationship.  Francois v. Francois,

46

599 F.2d 1286, 1291 (3d Cir. 1979) (applying Pennsylvania law).   Defendants have not met this

burden.

Additionally, in the context of commercial dealing, the Pennsylvania Supreme Court has

recognized fiduciary relationships where "one party surrenders substantial control over some

portion of his affairs to the other." In re Estate of Scott, 455 Pa. 429, 433, 316 A.2d 883, 886

(1974).  This Court has also recognized "[a] business relationship may be the basis of a

confidential relationship if one party surrenders substantial control over some portion of his

affairs to the other." Tyler v. O'Neill, 994 F. Supp. 603, 612 (E.D.Pa. 1998)(Joyner, J.).  As

implied above, finding a fiduciary relationship in a commercial setting, and any other setting for

that matter, is fact dependant.

> It is impossible to define precisely what constitutes a confidential relation. It is
> not restricted to any specific association of persons nor confined to technical
> cases of fiduciary relationship but is deemed to exist whenever the relative
> position of the parties is such that one has power and means to take advantage of
> or exercise undue influence over the other.

Young v. Kaye, 443 Pa. 335, 342-343 (1971) (internal citations omitted).  Here, it is rather clear

that plaintiff has pled sufficient facts to show both that Mr. McGann and PPI had the "power and

means to take advantage of or exercise undue influence over the" Harolds, and that Mr. Harold

surrendered control over his business affairs to Mr. McGann when he agreed that he would base

his compensation upon net sales and Mr. McGann's promise to account faithfully, since he

would otherwise have no control over the sales or the books and records to determine the sales.

As the Court of Appeals of California held in Stevens v. Marco, 305 P.2d 669, 679 (Ca. App.

1956):

> since Marco was in charge of the marketing of the device, plaintiff had also to
> rely on his business judgment with respect to production, and on his fidelity with

47

> respect to keeping and furnishing honest accountings of sales. Here, too, Marco
> occupied a superior position. There was present, therefore, all the classic elements
> of a confidential relation, and Marco owed to plaintiff the fiduciary obligations of
> utmost good faith and fair dealing of one occupying a status akin to that of a
> trustee.

Since a fiduciary/confidential relationship is fact dependant, Defendants can try to challenge it

*after discovery* in a Motion for Summary Judgment. However, having put the defense on fair

notice, the claim should not be dismissed here.

Additionally, unbeknownst to the Harolds, they were involuntary investors in PPI who

contributed "seed capital," and were labeled PPI and McGann as a shareholder.  Under these

circumstances, both PPI as the company and Mr. McGann as an officer, director and dominant

shareholder owed a fiduciary duty to the Harolds as a matter of law in their capacity as

"shareholder" or investor. Haymond Napoli Diamond, P.C. v. Haymond, 2004 U.S. Dist. LEXIS

17276 (E.D. Pa. 2004)(Shapiro, J.)("Officers and directors of a corporation owe a fiduciary duty

- a duty of loyalty - to the corporation and to its shareholders to act only for the benefit of the

corporation and the shareholders and to make proper disclosure of corporate activity."); Orchard

v. Covelli, 590 F.Supp. 1548, 1559 (W.D. Pa. 1984) ("stockholders in a close corporation owe

one another substantially the same fiduciary duty in the operation of the enterprise that partners

owe to one another."); In re Western National Corporation Shareholders Litigation, 2000 Del.

Ch. LEXIS 82, *18 (Del. Chanc. 2000)("A shareholder will be considered a fiduciary if it owns a

majority interest in or exercises control over the business and affairs of the corporation."

Given that Plaintiff has established a fiduciary/relationship for the purposes of Rule

12(b)(6), rescission is appropriate under Frowen v. Blank, supra,

**b.      Rescission is Appropriate Because Defendants McGann and PPI Materially and Substantially Breached Their Contract with Plaintiff**

Pennsylvania law recognizes that a material breach entitles the aggrieved party to rescind the contract. See, e.g., Keenheel v. Commonwealth, 134 Pa. Commw. 494, 502, 579 A.2d 1358, 1362 (Pa. Commw. 1990): "Petitioner correctly points out that rescission is proper when the complaining party has suffered a breach so material and substantial in nature that it affects the very essence of the contract and serves to defeat the objective of the parties."; Gray v. Gray, 671 A.2d 1166, 1172 (Pa. Super. 1996): "In *2401 Pennsylvania Avenue Corp. v. Federation of Jewish Agencies,* 319 Pa. Super. 228, 242-43, 466 A.2d 132, 139 (Pa. Super. 1983), we stated, 'Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end "is a question of degree; and it must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case." 4 Corbin, Contract, §946 (1951).'" In this context, Pennsylvania law is clear that "Materiality of the breach is a question of fact to be decided by the trier of fact on a case-by-case basis." Staley v. Bouril, 553 Pa. 112, 117 (Pa. 1998)

In the instant case, Mr. McGann promised to account to the Harolds for net sales and to compensate him and his heirs based upon those sales. Mr. McGann and PPI took none of these actions; instead, they appropriated the patent and all the royalties due thereon to use as seed capital while they deceived the Harolds. A finder of fact could determine that these breaches went to the heart of the contract as the Plaintiff was to receive no contractual benefit going forward other than the payment of royalties. Accordingly, rescission is appropriately pled on this ground.

49

      **c.**     **Rescission is Appropriate Because Defendants McGann and PPI Wilfully Refused to Pay Consideration.**

In cases in which the defendant has willfully refused to pay money owed to the plaintiff, rescission is warranted in Pennsylvania. In <u>DiPompeo v. Preston</u>, 385 Pa. 512, 515-16, 123 A.2d 671, 673 (1956), the Supreme Court held that:

> It is to be noted in this connection that, standing alone, failure to pay money on a designated day does not of itself justify rescission.  In the case of <u>Morrell v. Broadbent</u>, 291 Pa. 503, 505, this Court said: "Ordinarily, failure to pay money on a particular day is not such material departure from the terms of a contract as to justify a rescission by the other party, as the delay may be fully compensated by the payment of interest; hence time is not considered as of the essence of a contract unless there is an additional factor, such as wilful refusal to pay or change in the circumstances or in the situation of the parties resulting in injury from the delay, insufficient to be compensated by the mere allowance of interest.

<u>See</u> <u>also</u>, <u>Frankel v. Stein and Day</u>, 470 F. Supp. 209, 213 (S.D. NY 1979), <u>aff'd</u> 646 F.2d 560 (2nd Cir. 1980)(rescission was warranted based upon defendant's willful failure to pay full amount of royalties due an artist).  In this case, Plaintiff has pled a willful scheme to avoid payment of royalties to Plaintiff, in order to use the funds due and owing as "seed capital."  Mr. McGann paid $500 initially as part of his scheme to inspire Mr. Harold's confidence and the to defraud Mr. Harold and cause him to part with his valuable patent rights.  Thereafter no monies have been paid on account of net sales as required under the contract.  The only payments made were purposely mis-characterized by Defendants so as they could continue their scheme and conceal from Plaintiff that sales exceeded $800,000 in order to use the monies owed Plaintiff as "seed capital."  Even if this Court were to consider the payments in 2004 (never paid as royalties on net sales) totaling $1,500.00, this amount is merely 3.44% of total royalties which Defendants claim have been earned to dated ($43,514.00).  See McGann Memorandum of Law at 6.  This amount is *de minimis*, and supports a finding of a wilful refusal to pay.   Accordingly rescission

has been appropriately pled on this ground.

### d.    Rescission is Appropriate Because Defendants McGann Fraudulently Induced Plaintiff to Enter the HLA

Rescission is appropriate where the contract is based upon a fraudulent inducement.  In

College Watercolor Group, Inc. v. William H. Newbauer, Inc., 468 Pa. 103, 115, 360 A.2d 200,

206 (1976), the Supreme Court held that:

> Where a party is induced to enter into a transaction with another party that he was under no duty to enter into by means of the latter's fraud . . . the transaction is voidable as against the latter

Similarly, Section 164 of the Restatement (Second) of Contracts provides that:

> If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.

In this case, Plaintiff has pled that the transfer of the Patent from Robert Harold to Bryan

McGann was induced by fraud.  See Complaint at paragraphs 33 and 87.  As stated repeatedly

through the complaint, Defendant McGann never intended to pay the royalties as promised, but

to usurp Mr. Harold's monopoly patent power without any intent of paying the agreed upon

consideration for same, and instead sought to use the royalty payments due and owing as "seed

capital" to build his business.  Defendants nonetheless claim that the claim for rescission is not

proper upon a claim of fraud in the inducement because "the Pennsylvania Parole Evidence Rule

precludes the party requesting rescission from proving the necessary predicates to obtain this

remedy.  Citing Coram Healthcare Corp. v. Aetna US Healthcare, Inc., 94 F. Supp. 2d 589, 596

(E.D. Pa. 1999) (Bartle, J.).  This is not however what Judge Bartle held in Coram.  Instead, as a

predicate, Judge Bartle found that in order for the Parole Evidence Rule to bar a claim for

51

fraudulent inducement, the contract must be "written, unambiguous, and fully integrated."  In this case, it is bizarre that Defendants would even claim that the Parole Evidence Rule applies when they argue that the contract is "silent" on critical factors including the timing of royalty payments.  Moreover, Defendants further contend that the agreement is not fully written, as they claim there was a purported oral agreement to "convert the method of payment under the Harold/McGann Contract from a royalty on sales to a royalty on dividends for the investment of seed capital to build and fund the business."  Accordingly, as Defendants contend the contract is not fully written nor fully integrated, parol evidence is admissible under Coram.

Moreover, even if the parol evidence rule were applicable, the rule only acts to bar "evidence of fraudulent misrepresentations in the inducement **made prior to the execution** of ... [a written, unambiguous and fully integrated] Agreement.  94 F. Supp. 2d at 595.  Here, however, Plaintiff alleges, inter alia, that Mr. McGann never intended to honor the promises made in the contract. This is markedly different than the situation described in Coram, where the fraudulent statements were made prior to the execution of the contract.  Indeed, if defendants argument were correct, fraud in the inducement could never establish a claim for rescission. This is clearly not the law.  See College Watercolor Group, Inc. v. William H. Newbauer, Inc., Restatement (Second) of Contracts, §164, supra.  Accordingly, Defendants argument must fail as Mr. McGann's fraud is an appropriate basis for rescission as well.

      **e.**      **Rescission is Appropriate Because Defendants McGann and PPI Repudiate the HLA**

In <u>Polish American Machinery Corp. v. R.D. & D. Corp.</u>, the Third Circuit held that a party is "entitled to rescind ... if it proves that [the other side] repudiated the agreement." 760 F.2d 507, 511-512 (3d Cir. 1985). Here, there are sufficient facts of record to support a repudiation of the HLA by Mr. McGann and PPI. First, Defendants admit that Mr. McGann "convert[ed] the method of payment under the Harold/McGann Contract from a royalty on sales to a royalty on dividends for the investment of seed capital to build and fund the business." McGann Memorandum of Law at 6. Although, Defendants claim that this was done by agreement of the parties, this contention is not accepted by Plaintiff and avoids considering the facts pled and inferences therefrom in the light most favorable to Plaintiff.

Second, Mr. McGann repudiated the contract by transferring the Patent to PPI without ensuring that PPI would become the responsible party under the HLA. PPI then repudiated the contract by transferring the Patent to S&M NuTec without ensuring that S&M NuTec would become the responsible party under the HLA. Finally, Mr. McGann and PPI repudiated the contract by converting the Harold interest from royalty holder into that of a shareholder. These allegations adequately support a repudiation of the contract, thereby enabling Plaintiff to rescind same.

8.    **Rescission is Appropriate here where it is Defendants' Fraud which Prevents them from being Restored to their Prior Position**

Defendants claim that Mr. McGann "could never be returned to his pre-contract position" and therefore rescission is inappropriate. McGann Memorandum of Law at 27. In this regard, defendants claim that:

the product is the result of years of formulation, testing, FDA approvals,

53

> marketing, chemistry, veterinary cooperation and the building of a vast
> distributing network, all of which was the result of McGann's tireless efforts and
> none of which involved Harold.

Id.   As a preliminary matter, these alleged "facts" are outside the record and should not be

considered by this court as there is no proof of same.  Moreover, it is black letter law that where

restoration of the status quo is impossible because of the other parties' fault, fraud, or wrongful

conduct, the impossibility of restoration "is no obstacle to the rescission of the contract."  3

Henry Campbell Black, A Treatise on the Rescission of Contracts and Cancellation of Written

Instruments §  618 (2 Ed. 1929).  In this regard, it is stated that while the general rule provides

that a party must be restored to the status quo ante in order to obtain equitable relief from the

Court by way of rescission:

> it is further necessary to consider the cause which has rendered a restoration of
> the status quo impossible.  If it is attributable to the party seeking to rescind, - if,
> by his own act, he has disabled himself from restoring the consideration which he
> has received, - he cannot maintain an action for rescission, and this rule applies
> where the consideration was paid to him in cash, and he has spent it all and is
> financially unable to replace it or to raise the necessary amount from other
> sources, even though the money was so spent before he discovered that he had
> been defrauded.  On the other hand, if the party's failure or inability to make
> restitution under the contract is not his fault and not in consequence of his act, or
> is because of his innocent act done before learning of the fraud, and justice can be
> done without requiring such restitution, the contract may be rescinded and the
> equities of the parties adjusted in the decree.  And in particular, if the restoration
> of the former status is prevented by the opposite party, or if it has become
> impossible because of such party's fault, fraud, or wrongful conduct, such
> impossibility of restitution is no obstacle to the rescission of the contract.

Id. In this case, it is defendants' acts and omissions which cause any inability, to the extent an

inability exists, to return to the status quo ante.   Accordingly, defendants' argument is meritless.


**9.      Payment of $3,000 Is Not an Adequate Legal Remedy**

54

Defendants claim that rescission is inappropriate because the Harolds have under the

HLA "a legal remedy in the form of the $3,000 opt-out clause."  Again, this argument is

ridiculous.  The $3,000 provision contemplated in the contract was payment in the event of an

"unforeseen delay."  This was not intended to be payment in the event defendants opted to

defraud plaintiff and willfully refuse to pay royalties so that they could grow their business.

Accordingly, the $3,000 referenced in the contract does not provide an adequate remedy at law.

Further, it is stated that:

> the general opinion is that where a party is induced to enter into a contract by
> fraud or false representations, he has an absolute right to have it rescinded, and
> that though the facts may be such as would sustain a common-law action for fraud
> and deceit, and though he may, if he chooses, elect to pursue that course, he
> cannot be compelled to do so, and the existence of such a remedy at law is no
> ground for dismissing his suit in equity.

3 Henry Campbell Black, Treatise on the Rescission of Contracts and Cancellation of Written

Instruments, § 646 (2 Ed. 1929).  Moreover, it is recognized that

> the fact that a penalty for non-performace is named in the contract will not operate as a
> bar to a suit for rescission, where the amount of the penalty is not sufficient to give
> adequate damages at law.

Id. at § 197.

Moreover, there is no adequate remedy at law in this case, as the Plaintiff is entitled to

the return of the Patent, or at least the right to step into the shoes of PPI.  Because the total

amount of PPI's rights under its contract with S&M NuTec will not be known for years to come

as the total figure is adjustable based on net sales of products covered by the Patent, monetary

damages will not suffice, and Plaintiff must assume the PPI's position vis-a-vis S&M NuTec.

Moreover, even where there is an adequate remedy at law (such as payment of funds

due), rescission is appropriate where the defendant simply refuses to pay.  As noted earlier, the

Pennsylvania Supreme Court in <u>DiPompeo v. Preston</u> held that while mere failure to pay sums due "on a designated day does not justify rescission ... as the delay may be compensated by interest ... unless there is an additional factor, such as wilful refusal to pay ..."  385 Pa. at 515-516.  <u>See</u> <u>also</u>, <u>Frankel v. Stein and Day</u>, 470 F. Supp. 209, 213 (S.D. NY 1979), <u>aff'd</u> 646 F.2d 560 (2nd Cir. 1980)(rescission was warranted based upon defendant's willful failure to pay full amount of royalties due an artist). In this case there are sufficient allegations that Defendant simply refused to pay, instead determined to mislead the plaintiff and his decedent and convert the royalties for other purposes.

**10.     Plaintiff Provided Timely Notification of Rescission**

Defendants claim there was no timely rescission because "rescission must be prompt and in this case, approximately eight years have passed since the Harold/McGann contract was executed."  McGann Memorandum of Law 28.  Again, this argument is meritless.  The reasonable time to request rescission begins to run at the time a party has discovered facts.

> A right of action to rescind a contract for fraud, false representations, mistake, or other cause, does not accrue until the inured party acquires knowledge of the facts on which his claim for relief may be based.  Hence accepting as established the rule that a right of rescission must be exercised with reasonable promptness, the time with reference to which the question of promptness must be determined is the time when the party discovered the facts entitling him to complain, and not the time when the contract was made, and however long he may have acted under or acquiesced in the contract itself, he is not chargeable with laches if he acts promptly after discovering the facts, provided, of course, that he was not negligent or slothful in failing to discover them before. . . . This rule applies with special force where active measures have been taken to keep the parties in ignorance of the facts upon which a claim for rescission might be based, or where he has repeatedly been misled by erroneous advice as to his rights and interests. So also where his knowledge of the facts is partial or gradually acquired .

2 Henry Campbell Black, <u>Treatise on the Rescission of Contracts and Cancellation of Written</u>

Instruments, § 538 (2 Ed. 1929).

In this case, defendants McGann and PPI took steps to actively conceal from the plaintiff its entitlement to royalties by repeatedly indicating that the company was making no money, or words to that effect, yet nonetheless always promising to honor the contract.  Once the Harolds discovered this fraud in March, 2005, they promptly took action by retaining counsel and notifying defendants McGann and Harold that the contract was rescinded and directing them to notify S&M NuTec of same which defendants have confirmed they did.  Accordingly, plaintiff acted promptly.


**11.    The Gist of the Action Doctrine does not Bar Plaintiff's Claims for Fraudulent Misrepresentation, Constructive Fraud and Conversion**

Defendants argue that plaintiff's tort claims for fraud, constructive fraud and conversion are barred by the Gist of the Action Doctrine.  According to defendants, the Gist of the Action Doctrine is applicable here because they believe "the cause of action sounds properly in contract."  In this case, however, plaintiff has rescinded the contract and as Judge Bartle noted in Coram Healthcare Corp. v. Aetna, 94 F. Supp.2d 589, 596 (E.D. Pa. 1999), rescission is a remedy in equity to void a contract ab initio."  Accordingly, to the extent plaintiff has adequately pled facts to support rescission, there would be no contract left which would bar the bringing of tort claims.  This was recognized by Judge Reed in Asbury Auto Group, LLC v. Chrysler Insurance Co. wherein he stated:

> The gist of the action test generally bars fraud claims in cases where a defendant's alleged failure to perform its duty under the contract is inexplicably transformed into a claim that this failure amounts to fraud.  **In contrast**, Asbury has alleged that Chrysler misrepresented what Chrysler's duties under the contract would be.  **A person defrauded into entering a contract may either rescind the contract or affirm it and maintain an action for fraud.**

2002 U.S. Dist. LEXIS 117, *10-13 (E.D. Pa. 2002)(Emphasis supplied).  Thus, the Gist of the

Action Doctrine is not a bar where rescission is permitted.  Moreover, even if potentially

applicable, it is generally unwise to decide whether to apply the Gist of the Action Doctrine at

the pleading stage because "whether tort and contract claims are separate and distinct can be a

factually intensive inquiry."  CH&H Pennsylvania Properties, Inc. v. Heffernan, 2003 U.S. Dist.

LEXIS 14736, *18 n. 6 (E.D. Pa. 2003), citing Haymond v. Lundy, 2000 U.S. District LEXIS

8585, *24 (E.D. Pa. 2000).  A factually intensive inquiry is generally incompatible with notice

pleading, particularly in the instant case given the lengthy and complicated background of the

dispute.

In any event, the Gist of the Action Doctrine only prohibits the bringing of tort claims

which are merely "collateral to claims sounding in breach of contract."  The Brickman Group,

Ltd. v. CGU Insurance Co., 865 A.2d 918, 924 (Pa. Super. 2004).  In this regard, the Brickman

Court found that "although mere non-performance of a contract does not constitute a fraud, it is

possible that a breach of contract gives rise to an actionable tort.  To be construed as in tort,

however, the wrong ascribed to defendant must be the gist of the action, the contract being

collateral."  Id. at 927.  Thus, the Superior Court noted that the trial court correctly

acknowledged that "courts have generally not applied the [gist of the action] doctrine where the

defendant not only breached the contract but also made misrepresentations about the breach to

deceive the unsuspecting plaintiff into continuing the contractual relationship or not to assert its

contractual rights against the defendant."  Id. at 928, quoting lower court opinion at 53 Pa. D. &

C.4th 71, 84 (Pa. D. & C., 2001), citing June 2000, no Greater Philadelphia Health Servs. II

Corp. v. Complete Care Servs. L.P., . 2387, slip op. at 4 (C.P. Phila. November 20, 2000)

(Herron, J.) (citing <u>Northeastern Power Co. v. Balcke-Durr Inc.</u>, 1999 U.S. Dist. LEXIS 13437, 1999 WL 674332 at *12 (E.D. Pa.); <u>Polymer Dynamics Inc. v. Bayer</u>, 2000 U.S. Dist. LEXIS 11493, 2000 WL 1146622, at *6-7 (E.D. Pa.); <u>American Guarantee & Liability Ins. Co. v. Fojiani</u>, 90 F. Supp.2d 615, 623 (E.D. Pa. 2000); <u>Fox's Foods Inc. v. Kmart Corp.</u>, 870 F. Supp. 599, 609 (M.D. Pa. 1994)).  This is exactly what has been pled in the instant case and indeed defendants went one step further by attempting to have Mrs. Harold execute a Release so that she could have the benefit of being "treat[ed] . . . like a shareholder."

Here, the actions complained of far exceed the boundaries of the contract.  Plaintiff alleges that defendants fraudulently induced Mr. Harold to sell his patent based upon the knowingly false promise that they would pay royalties and in fact it was defendants' plan and design to convert those royalties to their own benefit to use as seed capital to build and grow their business.  In this regard, the Brickman court noted that Pennsylvania law "appears to permit fraud in the inducement claims in disputes involving contractual obligations," irrespective of the gist of the action doctrine.  <u>Id.</u> at 928.  Moreover, the District Courts have held that claims for fraudulent inducement are not susceptible to dismissal under the gist of the action doctrine.

> as the Pennsylvania Superior Court has recently held, the cases appear to apply the doctrine where the claims are for fraud in the performance of the contract, but not where the claims are for fraud in the inducement of the contract. "Fraud in the inducement of a contract would not necessarily be covered by [the 'gist of the action'] doctrine because fraud to induce a person to enter into a contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself."

> Weber's intentional misrepresentation claim seems to rely on its allegation that Providence Washington used fraud to induce Weber to engage in an agreement to keep Hansbury on light duty. Weber alleges that Providence Washington purposefully induced Weber to avoid placing Hansbury on workers' compensation so that Providence Washington could reduce the sum which it would ultimately owe to Weber. While it is not clear that such alleged fraud in the

59

inducement is not subject to the "gist of the action" doctrine, case law does seem to suggest that, where the fraud is used to induce the other party to enter into the contract, the contract is collateral to the fraud. Without Providence Washington's alleged misrepresentation, Weber would never have entered into an agreement to keep Hansbury on light duty. Therefore, the fraud appears to be the gravamen of this claim rather than the contract which occurred as a result of the alleged fraud.

Furthermore, courts have cautioned against deciding whether the gist of an action is in contract or tort at the motion to dismiss stage of a proceeding. Often times, without further evidence presented during discovery, the court cannot determine whether the gist of the claim is in contract or tort. In the instant matter, it would be inappropriate to dismiss Weber's intentional misrepresentation claim at this stage of the proceeding, before any discovery is conducted which could aid in a determination of the "gist" of this claim. As such, Weber is entitled to maintain its intentional misrepresentation claim at this time. However, Weber should be aware of the "gist of the action" doctrine as discovery proceeds.

Weber Display & Packaging v. Providence Wash. Ins. Co., 2003 U.S. Dist. LEXIS 2187, 10-12

(E.D.Pa. 2003).  Similarly, as the District Court noted in Longview Development LP v. Th Great

Atlantic & Pacific Tea Company, Inc.:

The doctrine does not provide for an absolute prohibition of tort claims when a breach of contract is alleged. "Although mere non-performance of a contract does not constitute fraud[,] it is possible that a breach of contract also gives rise to an actionable tort[.] To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral." Id. In other words, a party to a contract should be limited to a contract claim only when "'the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts.'" Id. (quoting Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001)).

Longview Dev. LP v. A&P, 2004 U.S. Dist. LEXIS 13977, *7 (E.D.Pa. July 20, 2004).  Thus,

the Court found that: "fraud in the inducement is not necessarily covered by the gist of the action

doctrine because fraud to induce a person to enter a contract is generally collateral to the terms

of the contract itself and implicates society's desire to avoid the fraudulent inducement of

contracts."  Id. at *10-11.

Here, Longview alleges that A&P fraudulently misrepresented that its property

for sale was unencumbered by any other agreement to which A&P was a party. Based on this misrepresentation, Longview entered into a contract to purchase the property only to discover that the United Food and Commercial Workers Union had a right of first refusal on the property.

The Court finds that the gist of the action doctrine does not apply to Longview's allegations. According to the facts alleged in the Complaint, A&P not only failed to perform its contractual duty to sell the property to Longview; it misrepresented its objective ability to perform its duty by concealing the Union's right of first refusal, inducing Longview to enter into the contract. As explained, case law indicates that where fraud is used to induce the other party to enter into a contract, the contract becomes collateral to the fraud. Thus, if Longview can prove after discovery that it entered into the contract because A&P committed [*14] fraud, Longview's action will be based in tort law, not contract law. Accordingly, A&P's motion to dismiss Longview's fraud claim under the gist of the action doctrine is denied without prejudice.

Id. at 13-14.  Here, defendant McGann promised to account to Robert Harold for net sales of the

product.  This promise, however, was made only to grab the patent, and defendant McGann

never intended to live up to his word.  This conduct, as more fully described above, is beyond

the scope of any contract and is prohibited "as a matter of social policy."  Quorum Health

Resources, Inc. V. Carbon Schuylkill Community Hospital, 49 F.Supp.2d 430, 432 (E.D.Pa.

1999)(Joyner, J.).  Accordingly, the gist of the action doctrine does not apply.

Again the District Court also noted that:

Further, courts have shown a reluctance to dismiss claims for fraud in the inducement early in the litigation. See, e.g., Little Souls, Inc. v. State Auto Mut. Ins., Co., No. 03-5722, 2004 U.S. Dist. LEXIS 4569, at *7-8 (E.D. Pa. March 15, 2004) (allowing fraud claim to survive motion to dismiss even though the court conceded that after discovery the gist of the action doctrine may bar the claim); Weber Display & Packaging v. Providence Wash. Ins. Co., No. 02-7792, 2003 U.S. Dist. LEXIS 2187, at *11-12 (E.D. Pa. Feb. 10, 2003) (refusing to decide, on a motion to dismiss, whether the fraudulent inducement claim and the breach of contract claim were so interwoven as to bar the fraud claim).

Longview Dev. LP, 2004 U.S. Dist. LEXIS 13977 at *12-13.

With regard to plaintiff's conversion claim, the complete failure to pay royalties to the

plaintiff went beyond the mere contractual obligation to pay a debt.  In this case, once monies for

net sales were received and calculated by defendants, it became the property of plaintiff and, as

such, represented a res to which plaintiff held title.  The theft and conversion of this property by

defendants accordingly represents more than a mere breach of the contract but, in fact, a theft of

property.  See Bernhardt v. Needleman, 705 A.2d 875, 878-879 (Pa. Super. 1997).  As Judge

Joyner noted under analogous circumstances:

> However, pursuant to the Agreement, Berger does have an interest in the fees due
> and owed to it, and such an interest can allow the fees to be the subject of a
> conversion. Thus, because Berger has a property interest in the settlement
> proceeds, the "gist of action" test and the "economic loss" doctrine does not bar
> Berger from proceeding on both a breach of contract and conversion claim.
>
> Moreover, even if the "gist of action" test and "economic loss doctrine" were to
> bar Berger from proceeding simultaneously on breach of contract and conversion
> claims, Berger can still plead both claims as alternative theories of liability
> against Scott. Indeed, Federal Rule of Civil Procedure 8(d)(2) states, "A party
> may set forth two or more statements of a claim or defense alternatively or
> hypothetically, either in one count or defense or in separate counts or defenses.
> When two or more statements are made in the alternative and one of them if made
> independently would be sufficient, the pleading is not made insufficient by the
> insufficiency of one or more of the alternative statements. A party may also state
> as many separate claims or defenses as the party has regardless of consistency and
> whether based on legal, equitable, or maritime grounds." Fed.R.Civ.P. 8(d)(2).
>
> Therefore, as Federal Rule of Civil Procedure 8(d)(2) allows Berger to plead two
> or more alternative claims against Scott for either breach of contract or
> conversion, regardless of their consistency, and whether based on legal, equitable
> or other grounds, Defendant's motion to dismiss the claim for conversion must, at
> this juncture, be denied. Fed.R.Civ.P. 8(d)(2).

Berger & Montague v. Scott & Scott, 153 F. Supp. 2d 750, 753-754 (E.D. Pa. 2001).

Accordingly, the gist of the action doctrine does not apply.

## 12.    Plaintiff's Tort Claims are not Barred by the Economic Loss Doctrine

Defendants argue that plaintiff's tort claims must be dismissed because "the economic loss doctrine prevents plaintiffs 'from recovering in tort economic losses to which their entitlement flows only from contract.'" McGann Memorandum of Law at 30.  Again, this argument does not recognize plaintiff's claim for rescission.  To the extent the contract has been rescinded and ergo is void ab initio, the former contract cannot present a bar to recovery in tort.

Additionally, in Duquesne Light Co. v. Westinghouse Elec. Corp., the Third Circuit held that "the economic loss doctrine . . . only covers situations in which "a party in privity of contract with another suffers an injury to a product itself, resulting in purely economic loss." 66 F.3d 604, 620 (3d Cir. 1995); see also Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 658 (W.D.Pa. 1999)(D. Brooks Smith, J.).  Moreover,  the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows **only** from a contract." Quorum Health Resources, Inc. v. Carbon-Schuylkill Community Hosp., Inc., 49 F. Supp. 2d 430, 432 (E.D.Pa. 1999)(Joyner, J.), citing  Duquesne Light Co., 66 F.3d at 618.

In the instant case, not only has Plaintiff alleged injury to him as distinct from injury to a product, but, as replete throughout the complaint, his entitlement to relief does not only "flow from a contract" Additionally an exception to the doctrine arises when a "misrepresentation is intentionally false, that is, fraudulent, the plaintiff's fraud claim may proceed."   Based upon the allegations of the complaint, "[a]t this stage of the proceedings . . . [this] exceptions could apply, depending upon the factual record developed during discovery."  Sunquest Info. Sys., Inc.,40 F. Supp. 2d at 658(D. Brooks Smith, J.). Accordingly, the Economic Loss Doctrine should not preclude suit at this stage.

**13.   Plaintiff's Tort Claims Are Not Barred By the Statute of Limitations**

Defendants claim that "[e]ach of Plaintiff's tort claims are ... barred by Pennsylvania's two-year statute of limitations which governs Plaintiff's claims of fraud, constructive fraud and conversion."  Moreover, Defendants claim that the discover rule is inapplicable "Because the documents attached to the Complaint evidence McGann's disclosure of the very same information which Plaintiff alleges was concealed or misrepresented."  Again this argument is meritless.  First, Mr. Babbit conceded on March 28, 2005 that sales numbers had not previously been reported: "Reporting sales was understood not to be necessary..."  This is also obvious form the correspondence and the oral communications[17], where no net sale numbers were ever reported.  More importantly, Defendants continuously represented that the company was not making money and misrepresented the basis upon which the payments were being made in 2004 so as to conceal the fact the significant net sales were being generated.  Plaintiff relied upon all of these representations to his detriment and, accordingly, should be protected by the discovery rule.

**14.   Plaintiff Has Alleged Misrepresentations to Support His Fraud Claim**

Defendants contend that the "letters attached to the Complaint reveal that net sales were not concealed from Plaintiff."  This is simply not so.  None of the letters reveal the net sales

---

[17]Defendants claim that Plaintiff cannot rely upon statement made after the contract is executed represents a misunderstanding of the parol evidence rule.  First, as noted above, because Defendants contend that the HLA is not fully written nor fully integrated contract, parol evidence is admissible.  Moreover, the parol evidence rule only bars evidence of statements "**made prior to the execution** of ... [a written, unambiguous and fully integrated] Agreement" Coram, 94 F. Supp. 2d at 595.

figures, and, indeed, this is probably because for some reason Mr. McGann and PPI believed that "Reporting sales was understood not to be necessary." Beyond this, Plaintiff rests upon the statement of facts above.

Next Defendants argue that Plaintiff was somehow not defrauded because the Plaintiff "could have, at any time, opted out of the royalty arrangement and received $3,000." While Plaintiff is sure that Defendants would have preferred that Plaintiff exercise this option, the fact that he did not is evidence of nothing except the continued faith the Harolds misplaced in Mr. McGann.

Finally, Defendants claim that there could be no fraud because all royalties were "remitted in a reasonable time." For the reasons set forth at length above, this argument is meritless.

**15.    Plaintiff's Fraud Claims are Properly Based on Misrepresentation of Past and Present Material Fact and Are Particularly Pled**

Without any analysis, Defendants contend that Plaintiff's fraud cause of action must fail because "Plaintiff has failed to allege any misrepresentations whatsoever, let alone misrepresentations relating to a past or present fact." In this regard, they liken the instant case to a situation in which a "licensor ... overestimated the demand for the products under the patent." This, case however, does not involve mere overestimation, but rather involves an attempt to hide the fact that products were generating significant net sales, as set forth at length above. The allegations set forth above further establish the time frame in which the fraud took place as well as the date of letters and conversations and give specifics as to the misrepresentations and omissions made. Accordingly, Defendants arguments are meritless.

65

**16.      Plaintiff Has Pled a Valid Cause of Action for Conversion**

Defendants concede that a "plaintiff may bring suit 'if he or she had ... an immediate right to possession of the chattel at the time of conversion.'" In this case, the Harolds had an immediate right to possession of "5% on net sales of products covered by claims of the patent." Cmplt. Exh. B.  As Judge Joyner noted in an analogous situation, this is a "contract for division of work in exchange for a division of property," i.e. the net sales of the products covered by the patent.  Berger & Montague v. Scott & Scott, 153 F. Supp. 2d 750, 753 (E.D. Pa. 2001).  Thus the Court noted that "once a fee has been received, the referral fee can be the subject of conversion." Id.  As Judge Joyner held:

> In the instant case, Berger and Scott entered an Agreement, that upon settlement of the case, the firms would divide the 50% of total fees awarded from the clients, according to each firm's respective lodestar. Furthermore, both Berger and Scott would be reimbursed for their costs. Moreover, Scott was responsible for the collection and disbursement of the fees received from the clients. The total fees awarded were $ 1,968,170.90, and from this amount Berger and Scott were due $ 984,085.45. The $ 984,085.45 was forwarded to Scott for distribution, however, Scott has not paid Berger its full share of the $ 984,085.45. Scott has only paid Berger $ 315,000, which does not reflect Berger's share of the fees due under the Agreement.
>
> Under Berger and Scott's Agreement, the fees at issue are not specifically labeled "referral fees," as they are in Bernhardt. However, pursuant to the Agreement, Berger does have an interest in the fees due and owed to it, and such an interest can allow the fees to be the subject of a conversion.

153 F. Supp. 2d at 753.  See also Bernhardt v. Needleman, 705 A.2d 875 (Pa. Super. 1998).  In this case, by their own admission, Mr. McGann and PPI have been collecting net sales since 2003 to which the Harold claim attaches.  Accordingly, Plaintiff has sufficiently pled a claim for conversion.

**17.    Plaintiff Has Pled Facts Sufficient to Establish a Fiduciary and/or Confidential Relationship With Defendants McGann and PPI**

For the reasons set forth above, Plaintiff has pled sufficient fact to establish a fiduciary and/or confidential relationship with Mr. McGann and PPI.[18]

**18.    The Gist of the Action Doctrine Does Not Bar Plaintiff's Claim for Breach of Fiduciary Duty**

Defendants claim that because the fiduciary relationship alleged by Plaintiff is not "well-established and clearly-defined by Pennsylvania law or policy," claims based upon same are barred by the gist of the action doctrine.   The facts as stated above, however, show that the parties' relationship is rather typical of those that are confidential in Pennsylvania.   Moreover, contrary to Defendants' assertion, their relationship was not entirely governed by the contract, as Defendants McGann and PPI unilaterally decided to treat the Harolds as investors/shareholder - a status the Harolds were not provided under the HLA.   Accordingly, this argument must fail.

Finally, as noted above, to the extent the contract is void *ab initio*, the gist of the action doctrine cannot bar the claim for breach of fiduciary duty.

**19.    Plaintiff is Entitled to Equitable Relief**

Citing the District Court's opinion in <u>Iversen Baking Co. v. Weston Foods</u>, 874 F. Supp. 96, 102 (E.D. Pa. 1995) as "instructive," Defendants claim that all counts for equitable relief

---

[18]Defendants do make one comment which warrants a response.  Defendants claim that there was no fiduciary relationship because "If Harold believed that McGann's decision-making was inappropriate, he was entitled to exchange his royalty for $3,000."  This proposition, to the extent it even affects whether a confidential relationship existed, assumes the Mr. McGann truthfully shared his "decision-making" with the Harolds.

must be dismissed.  <u>Iverson</u>, however is rather limited, and merely states the generally accepted

principle that:

> Plaintiffs have pleaded promissory estoppel alternatively to their breach of
> contract claims (Counts I and II). They and Defendants agree that in
> Pennsylvania, a promissory estoppel claim can only exist in the absence of a
> contract. Courts have held that breach of contract and promissory estoppel may be
> pleaded in the alternative, but that if the court finds that a contract exists, the
> promissory estoppel claim must fall.

874 F. Supp. at 102.  Plaintiff has followed the same path in this case alleging breach of contract

and unjust enrichment as alternatives. Moreover, as discussed above, the tort counts in this case

arise from the extra-contractual conduct of the defendants and their confidential/fiduciary/trust

relationships with the plaintiff.  A such, Defendants tortious conduct is not subsumed solely

within the confines of a breach of contract claim.

**20.     Plaintiff's Unjust Enrichment Count Is Legally Sufficient**

Defendants concede that unjust enrichment is appropriate where there is no contract.

Accordingly, to the extent this court finds that rescission is appropriate, then unjust enrichment

would lie as there no longer exists a contract.

**21.     Plaintiff is Entitled to a Legal Accounting**

Defendants argue that there can be no legal accounting because there is no valid claim for

breach of contract.  For the reasons set forth above, Plaintiff has adequately pled a claim for

breach of contract.  Accordingly, an accounting is appropriate.

68

**22.**     **Plaintiff is Entitled to an Equitable Accounting**

Defendants claim that an equitable accounting is improper because there is no evidence of a fraud, misrepresentation or breach of fiduciary duty.  For the reasons set forth above, Plaintiff has adequately pled those claims.  Moreover, in the event this Court finds that rescission is appropriate, Plaintiff will need to invoke its equitable powers to order an accounting as there is no longer a contract at law.

**23.**     **Plaintiff Has a Proper Claim for Restitution**

Defendants concede that restitution is appropriate where there is no contract. Accordingly, to the extent this court finds that rescission is appropriate, then restitution would lie as there no longer exists a contract.

**24.**     **Plaintiff is Entitled to Restitution under the Restatement (First) Restitution, §128**

Defendants claim that restitution is inappropriate under Section 128 because "Plaintiff cannot maintain a claim for conversion or any other tort."  For the reasons set forth above, this claim is meritless.

**25.**     **Plaintiff is Entitled to Restitution Pursuant to Restatement (First) of Restitution § 130**

Defendants claim that restitution is inappropriate under Section 130 because "Plaintiff has not alleged a sustainable tort upon which to base this claim." As alleged throughout, Defendants obtained both the Patent and the royalty monies owed the Harolds through tortious means. Accordingly, for the reasons set forth above, this claim is meritless.

69

**26.     Plaintiff is Entitled to Restitution Pursuant to Restatement (First) of Restitution § 138**

Defendants claim that restitution is inappropriate under Section 138 because "Plaintiff cannot properly allege a fiduciary relationship existed between Harold and Defendants."   For the reasons set forth above, this claim is meritless.

**27.     Plaintiff is Entitled to Restitution Pursuant to Restatement (First) of Restitution § 190**

Defendants claim that a claim for breach of trust/trustee ex malificio is inappropriate under Section 138 because "no fiduciary relationship existed between Harold and Defendants." For the reasons set forth above, this claim must fail.

**28.     Plaintiff has Pled Sufficient Facts to Establish that S&M NuTec is Not a Bona Fide Purchaser for Value**

As the District Court found in <u>Millenium Enterprises v. Tobias Knoblauch Private Bank</u>, "The person claiming to be a bona fide purchaser bears the burden of proof" and "requires a fact-specific inquiry by the court." <u>Millenium Enterprises v. Tobias Knoblauch Private Bank</u>, 1991 U.S. Dist. LEXIS 12275 (E.D. Pa. 1991).  In this case, S&M has not, and cannot at this stage before discovery, establish that it was not on inquiry notice of Plaintiff's claim.

> Inquiry notice is not entirely distinct from actual or constructive notice; rather, it is a duty of a purchaser to conduct a reasonable investigation upon gaining constructive or actual notice of facts which would make a prudent person suspicious. The doctrine is moored upon the existence of preliminary facts which serve to put the purchaser upon inquiry.

<u>In re Ryan</u>, 851 F.2d 502, 511 (1st Cir. 1988).  Similarly, in <u>McAteer v. McMullen</u>, 2 Pa. 32, 33-34 (1845), the Pennsylvania Supreme Court held:

> The court instructed the jury that Neen was not a bona fide purchaser without notice, because the testator, in the will under which he of course must claim, devised to his son Robert fifty acres of the north-west corner of the tract, that being the part which last answer the description in the will, unless it had been selected elsewhere and never given up. That any person on reading the will would be led to inquire whether Robert Mullen had got his fifty acres, and where, and whatever would put him on inquiry would be notice. This is a correct application of an acknowledged elementary principle, and consequently effects the purchaser with constructive notice.

Here,  Plaintiff has alleged that:

> Upon information and belief, S&M NuTec knew, or should have known, through the exercise of appropriate due diligence in the context of the negotiation and execution of the transaction documents believed to have been executed on or about March 7, 2005, that Defendants McGann and PPI  had abused their relationship with Plaintiff and were in material breach of the Sale Agreement.

Cmplt. ¶67.  In this regard, as discussed above, S&M NuTec was provided with "open" access to PPI's books and records and was permitted to utilize due diligence.  Had S&M carefully reviewed the books and records of PPI, it would have been well aware that neither PPI nor McGann had paid any royalties on account of net sales and that there was no provision in the HLA to convert the Harold interest to an equity interest or a right to collect royalties based upon payment of dividends. The fact alone that no payments were made on account of net sales should have put S&M on at least inquiry notice that PPI and McGann were in material breach of the HLA.

Moreover, Pennsylvania law is clear that assuming one is an innocent purchaser, he or she is only fully protected from latter claims if the full consideration has been paid.

> To protect a purchaser, by the English rule there must be execution and payment of the entire purchase, for there is no protection for partial payments; by our own, as it was held in Youst v. Martin, 3 Serg. & Rawle 423, 430, it is otherwise. If then it turn out that the plaintiff had paid the whole purchase-money when notice was received, she will be protected for the whole: if she had paid a part, she will be protected for so much, just as if it had been paid by the vendor to the ground

71

tenant, and a proportionate abatement of the rent will be made for the residue: if
she had paid nothing, she will be protected for nothing.

Juvenal v. Jackson, 14 Pa. 519, 524 (Pa. 1850).  In this case, far less than half the consideration

has been paid by S&M, it cannot be a bona fide for the full value of the transaction. Cmplt Exh.

H.

## 29.    Plaintiff has Pled an Appropriate Action for Declaratory Relief

Defendants argument concerning declaratory relief ignores the fact that Plaintiff has pled

a valid claim for rescission.  In this regard, it is black letter law that:

if a third person takes property with knowledge that it was procured by his grantor
from the original owner by fraud, false representations, duress, etc., or if he
knows facts sufficient to put a man of ordinary business prudence on inquiry,
which would lead to such knowledge, then he cannot claim protection of a bona
fide purchaser, and the transfer to him is no obstacle to a rescission or
cancellation at the instance of such original owner.

3 Edward Campbell Black, Treatise on the Rescission of Contracts and Cancellation of Written

Instruments §640 (2nd Ed. 1929).  Here, as discussed above, S&M certainly had more than

enough facts available to it to know that Plaintiff had a valid claim for rescission against PPI and

McGann by virtue of their fraud, breach of fiduciary duty, willfull refusal to pay consideration,

material and substantial breach and repudiation.  Accordingly, Defendants argument must fail.

## 30.    Plaintiff is Entitled to Pursue an Equitable Lien

An equitable lien is imposed to protect against and disgorge any unjust enrichment. HCB

Contrs. v. Rouse & Assocs., 1992 U.S. Dist. LEXIS 9916 , *30 (E.D. Pa 1992).  In this regard, it

is "a remedial device to protect a party against some inequitable loss." Id. at *28.  As Defendants

72

already conceded, unjust enrichment is permissible in the event this Court finds there is no

contract.  Accordingly, because Plaintiff has plead sufficient facts to warrant rescission, an

equitable lien is appropriate.

**31.     Plaintiff is Entitled To Equitable Rescission**

Whether a remedy or a direct cause action, for the reasons set forth above, Plaintiff is

entitled to rescission.

**27.     Plaintiff has Properly Requested a Constructive Trust Be Imposed**

Plaintiff recognizes that a constructive trust is a remedy imposed by the Court, and only

pleads it as a remedy for breach of trust, which as delineated above is manifest.  In this regard,

Plaintiff has appropriately pled acts of fraud or other wrongful conduct.  Moreover, as Judge

Padova noted in HCB Contrs. v. Rouse & Assocs., 1992 U.S. Dist. LEXIS 9916 (E.D. Pa. 1992):

> "Where a person holding title to property is subject to an equitable duty to convey
> it to another on the ground that he would be unjustly enriched if he were
> permitted to retain it, a constructive trust arises." Restatement of Restitution § 160
> (1937).

The Court further noted:

> The equation changes slightly, however, when the property upon which an
> equitable "mortgage" or an equitable "lien" hangs is disposed. In that instance, a
> constructive trust may be imposed upon the product of the disposition to prevent
> unjust enrichment. See Pierro, 438 Pa. at 127, 264 A.2d at 696 (A constructive
> trust will be imposed when "'legal title to property is obtained by a person in
> violation, express or implied, of some duty owed to one who is equitably
> entitled.'" (quoting Equity Jurisprudence § 1044)); Zvonik v. Zvonik, 291 Pa.
> Super. 309, 318-19, 435 A.2d 1236, 1241 (1981)(To prevent unjust enrichment, a
> constructive trust may be imposed even if property is not obtained in violation of

73

some duty.); Restatement of Restitution §§ 202-206. Following [*39] the res analysis, the reason for this is that an identifiable res, the proceeds from the disposition, evolves from the transaction.

HCB Contrs. v. Rouse & Assocs., 1992 U.S. Dist. LEXIS 9916 (E.D. Pa. 1992).  Here, both PPI

and McGann, would be unjustly enriched if they were permitted to retain the benefits of the

Harold Patent for all the reasons stated above.  Accordingly, a constructive trust is appropriate.

NEIL E. JOKELSON & ASSOCIATES, P.C.


_____NEJ 2239
NEIL E. JOKELSON, ESQUIRE
DAVID E. JOKELSON, ESQUIRE,
DEREK E. JOKELSON, ESQUIRE,