**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT WILLIAM HAROLD, | : | |
| Administrator of the Estate of | : | |
| ROBERT GEORGE HAROLD, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | 05-CV-1493 |
| BRYAN A. McGANN, et al. | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

Anita B. Brody, J.                                              December        , 2005

## I.  INTRODUCTION

Plaintiff Robert William Harold ("Plaintiff") brings this action against defendants alleging various breach of contract and tort claims arising out of a patent sale, and requesting both legal and equitable relief, including a claim pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.  Subject matter jurisdiction for the other claims is founded upon diversity pursuant to 28 U.S.C. § 1332, as Plaintiff is a Pennsylvania citizen and defendants are citizens of other states, with the corporate defendants maintaining their principal places of business outside Pennsylvania.  Plaintiff alleges that defendant Bryan A. McGann ("McGann") fraudulently induced Plaintiff's father, Robert George Harold ("Decedent") to sell McGann a patent for a product to help administer medicine to pets, and then breached the contract in numerous ways. Plaintiff also alleges that McGann and the company he formed to market the patented product,

1

Pill Pockets, Inc. ("PPI") breached their fiduciary duty or confidential relationship with Plaintiff and Decedent, engaged in conversion, unjust enrichment, breach of trust, fraudulent misrepresentation, and constructive fraud.  In addition to damages and rescission for these claims, Plaintiff requests declaratory judgment and the imposition of an equitable lien against all defendants, including S&M NuTec ("S&M").  Presently before me are two motions to dismiss all claims, one filed by S&M (Doc. #8) and one filed by McGann and PPI (Doc. #9).[1]  For the reasons set forth below, S&M's motion is granted and McGann and PPI's motion is granted in part and denied in part.


## II.  FACTUAL BACKGROUND[2]

In 1989, Decedent obtained United States Patent No. 4,857,333 ("the Patent") for his invention entitled "Food Product for Administering Medication to Animals." (Compl. ¶ 13.)  In April 1997, McGann began soliciting Decedent to purchase the patent, sending letters and a draft agreement.  (Id. ¶¶ 14-16.)  On or about May 15, 1997, McGann signed and forwarded a written agreement ("the Sale Agreement") to Decedent, who executed it in Pennsylvania on or about May 19, 1997.  (Id. ¶ 17-18.)  The first sentence of the Sale Agreement stated that "This letter will serve as the agreement between us for the sale and assignment" of the Patent.

The Sale Agreement provided that Decedent, by signing the Sale Agreement and

---

[1]Although the defendants filed two separate motions to dismiss, the subsequent pleadings on the issue addressed them as consolidated.

[2]As required when ruling on a motion to dismiss, the facts as averred by plaintiffs are accepted as true for purposes of this motion.  Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996). "But a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

accepting the enclosed check for $500, sold the Patent under the following terms:

- Bryan McGann will pay the maintenance fee on the patent which is approximately $1,175 plus attorney fees.

- Bryan McGann will pay the costs of preparing the sale and assignment documentation.

- Bryan McGann will pay to Bob Harold a royalty of 5% on net sales of products covered by the claims of the patent, up to a total cap of $100,000.00 in cumulative royalty payments.  This royalty cap represents cumulative net sales of $2,000,000.00.  Bryan McGann will report semi-annually to Bob Harold on the net sales of the product covered by this patent.

- If the patent is sold to another party, this agreement will survive the sale as a contingent payment obligation provided that the total payments to Bob Harold have not exceeded the $100,000.00 royalty cap.

- If the patent is infringed by a third party and a settlement is received, Bryan McGann, or the then owner of the patent, will pay to Bob Harold 5% of the net settlement amount (less costs, attorney fees etc.) up to $100,000.00.

- Bob Harold will provide background information on marketing efforts and company relationships concerning the patent.

- Bryan McGann will have the right of first refusal on any future invention and associated patent developed by Bob Harold if it is in the pet care field.

- In the event of unforeseen delays in the generation of sales, Bob Harold can exchange his royalty options for cash equal to $3,000.00 which is substantially equal to the patent sales price originally agreed upon between the parties ($5,000 less maintenance and attorney fees).

(Compl. Ex. B.)

The Sales Agreement was accompanied by a cover letter stating that McGann, after consulting his attorney, "deleted the minimum payment due under a sale and simply made it so [the] agreement survives any sale and will be the responsibility of any future owner of the patent." (Id.)   Attached to the Sale Agreement was a patent assignment which Decedent executed on May 19, 1997 in Philadelphia. (Compl. ¶ 22.)

Plaintiff alleges upon information and belief that before and on May 15, 1997, McGann represented to the Decedent that he would promptly produce and market a product based on the patent in order to generate sales. (Id. at ¶ 23.)  On August 21, 1997, Decedent accepted an addendum to the Sale Agreement assigning to McGann "any rights that may exist to the potential trade name 'STOWAWAY'" and rights to Decedent's artwork "for use on the labeling of the product." (Compl. Ex. C.)   McGann attended law school at the University of North Carolina at Chapel Hill, without Decedent's knowledge, and did not communicate with Decedent from mid-1998 until March 14, 2002.  (Compl. ¶ 26.)

On March 14, 2002, McGann wrote Decedent a letter updating him on the status of the patent product. (Compl. Ex. D.)  The letter read:

Dear Bob and Dorothy:

I know this letter must find you quite surprised since it has been so long.  Given the twists and turns over the last few years, I am a little surprised to have the opportunity to write you with possible good news.  In 1998 I returned to school and earned my law degree from the University of North Carolina at Chapel Hill.  I have never lost my desire to get Stow Away to market, but as time went by, each opportunity seemed to have a catch that thwarted my efforts.  On a more positive note, I have a four year old that has kept my non-law school attention.

Now I am able to give you a different report.  I am involved with an individual in Colorado who obtained a patent in 2000 on different designs of Stow Away.  While she cannot make her product without violating the Harold patent, she has the trademark on the name Pill Pockets which has received great praise in consumer focus groups.  She is also very well connected in many of the veterinary circles and has given us the contacts we needed to move ahead full speed.  In July of this year, we will introduce the product at the AVMA Convention in Nashville.  We are displaying the product in an exhibitor booth and will hold a news conference along with some of our veterinary consultants.  In all, we hope to build this effort quickly, and hope to entertain offers in the near future to purchase the product.  Either way, however, we have received a great deal of support and enthusiastic cooperation as we have worked to get to this point.  I will keep you informed of all events as they unfold.

> I hope this letter finds you well.  I know that you were having tough days back in 1997 and 1998 and I pray that you have found relief from the pain you described.  I will look forward to talking with you soon. Take good care.

<u>Id.</u>  McGann's signature line included the credentials "J.D., M.B.A." <u>Id.</u>

In July 2002, Decedent responded in an email to McGann that he and his wife were "thrilled to death" about the news because they had "been under EXTREME stress for many months" due to family medical problems, including Decedent's migraines.  (Compl. Ex. E.) Decedent apologized for not writing back sooner, and wrote "Good luck at the show and thanks so much for your persistence." <u>Id.</u>  On September 29, 2002, Decedent died intestate.  (Compl. ¶¶ 30, 34.)

Plaintiff informed McGann of Decedent's death at some point, at which time McGann informed him that he would honor the Sale Agreement.  (<u>Id.</u> ¶ 31.)  Shortly thereafter, McGann called Dorothy Harold and confirmed that he would honor the contract.  (<u>Id.</u> ¶ 32.)  Plaintiff alleges that McGann never intended to honor the Sale Agreement or the promises to Plaintiff and Dorothy Harold that he would honor the Sale Agreement.  (<u>Id.</u> ¶ 33.)

At some time unknown to the Harolds, McGann incorporated PPI, named himself President and Chief Executive Officer of PPI, and transferred the Patent to it.  (<u>Id.</u> ¶ 34.) Plaintiff alleges that McGann and PPI failed at the time of the patent transfer to execute appropriate documents ensuring that the Sale Agreement would survive the transfer as the responsibility of PPI, which they knew or should have known they were required to do.  (<u>Id.</u> ¶ 35- 36.)

Plaintiff called McGann periodically from 2002 through early 2005 to ask for updates on the product, and at no time did McGann inform him of any net sales of product. (<u>Id.</u> ¶ 37.)

McGann told Plaintiff on one or more occasions that no money was being made and that he was not even taking a salary. (Id.)  Unknown to the Harolds, products covered by the Patent had enjoyed over $35,000 in sales in the second half of 2003, entitling Decedent to over $1,800 in payments under the Sale Agreement. (Id. at ¶ 38.)

McGann wrote on PPI letterhead to Dorothy Harold on January 15, 2004, stating:

...Much has happened since we last spoke on the phone and I wanted to give you an update on the progress that Pill Pockets is making.  Last year we merged with an investment group out of Colorado in exchange for a contribution of capital.  This allowed us to build a plant in North Carolina in which we manufacture and distribute the product.  So far, we have accomplished that task and we are now beginning to promote and actively market Pill Pockets for both dogs and cats.  This changed my ownership of the Harold patents, but as I had agreed to do with Mr. Harold back in 1997, the agreement between us remains my personal obligation.  I am happy to send you that portion of any dividends or equity I receive up to the stated maximum, and I must tell you, I believe we will reach that maximum!

I am enclosing your first check for $1,000 that represents 5% of the proceeds I received in the merger with the Colorado company.  I spoke with you [sic] son recently and told him that I will also be reporting to you on a quarterly basis instead of twice of [sic] year as called for in the agreement.  This will keep you better informed of the happenings of the company.

(Compl. Ex. F.)  McGann failed to make any reports on net sales from May 1997 until March 2005.  (Compl. ¶ 41.)

Plaintiff alleges that McGann and/or PPI made over $800,000 in sales through 2004, and that net sales of products covered by the Patent in the first six months of 2004 were over $300,000, entitling the Harolds to over $15,000 in payments under the Sale Agreement.  (Id. ¶ 42-43.)  McGann wrote to Plaintiff on PPI letterhead on September 14, 2004, stating "I wanted to update you on the progress of Pill Pockets and the work that we are doing to build this company."  (Compl. Ex. G.)  McGann stated that he and PPI had "secured 14 veterinary

distributors that are selling Pill Pockets across America and in Canada" and that they were "attending the larger trade shows and signing distributors to carry [their] products." Id.  McGann informed Plaintiff that Pill Pockets would soon be available in all 750 Petco stores, and wrote:

> We have begun a three step process to meet the demand we now expect will come quickly.  First, we have leased a new facility that is 4 times larger than our current location.  Second, we have designed new packaging that updates our image, eliminates labels, and reduces our cost from $0.50 per bag to $0.09 per bag.  Lastly, we are leasing bagging, weighing, and sealing machines to speed our production process and reduce our need for labor.
>
> As you can see, we are nearing the point where we will be a profitable company [...] I am also enclosing a check for $500 for you.  Even though I am not taking a salary and we have yet to reach break-even, I believe that will change soon and I will regularly receive salary and dividends and checks to you will become more regular.  I apologize for not writing sooner, I have been traveling for 6 months to all of these shows.

Id.  A check for $500 accompanied the letter, with a memo on the check stub stating "Advance on Royalty Payments." Id.

Plaintiff alleges that by failing to account properly for the net sales and by characterizing the payment as an "advance," McGann and PPI "materially and deliberately misled the Harolds and concealed from them material information which they had a duty to disclose" including the fact that they were not paying the Harolds royalty payments that they were entitled to and were using those funds "for their own use and benefit." (Compl. ¶ 46.)  Net sales of products covered by the Patent in the second half of 2004 were over $500,000, entitling Decedent to over $25,000 in royalties under the Sale Agreement.  (Compl. ¶ 47.)  By the end of 2004, sales of the product were over $800,000 and McGann owed the Decedent at least $40,000.  (Id. ¶ 48.)

Plaintiff alleges that the September 2004 letter was "materially misleading as it strove to create the false impression that there were no appreciable sales and no royalties yet due when in

fact substantial royalties were due," and that McGann and PPI's failure to report sales "was part of a conspiracy to convert Plaintiff's property....to their own use and to defraud the Harolds" by giving the false impression that the Patent was not generating significant sales. (Id. at ¶ 50-51.)

Around January 28, 2005, PPI entered a "non binding letter of intent" with S&M for the sale of substantially all of PPI's assets including the Patent. (Compl. Ex. H.)  The letter of intent proposed a total sale price of $4,100,000, with $2,000,000 payable at closing and the balance payable over a two year period along with royalty payments through 2017. (Id.)  On March 2 or 3 2005, McGann contacted Plaintiff to inform him that he was close to selling the Patent to S&M and that in order to close the transaction, he needed Dorothy Harold to sign off on some paperwork by the weekend before closing on Monday March 7, 2005. (Compl. ¶ 53.)  In return, McGann stated that Dorothy Harold would get "the substantial amount of $14,630" after closing. (Id.)  Plaintiff alleges that McGann deliberately concealed the existence of the over $40,000 in royalty payments then due the Harolds and created the false impression that the $14,630 that Mrs. Harold would receive was derived from the sale to S&M. (Id. ¶ 54.)

At 5:32 p.m. on Thursday March 3, 2005, McGann and PPI faxed Plaintiff a cover letter enclosing the Non Binding Letter of Intent, a cover letter for it from S&M to PPI dated January 19, 2005, and a proposed agreement for Dorothy Harold to execute on behalf of the estate of Decedent. (Compl. Ex. H.)  The cover letter from McGann stated:

> As for your mom and her part in the process, it is my intention with this new agreement attached that she be able to take part in the payment stream for the full 13 years of the S&M NuTec agreement (if necessary), instead of the payments terminating at the expiration of the claims of the Harold patent in May of 2008.  More importantly, the current agreement between us calls for payment on sales of product, while the attached, proposed agreement will treat her like a shareholder of our company and pay her also on the closing proceeds of the sale of Pill Pockets as a company which includes other

patents, equipment, and trademarks.

When I decided not to sell this product on my own and formed Pill Pockets with the investors from Colorado, I told your mom that I would pay her 5% of any dividends I received up to her maximum.  Though I sent her $1,500 over this period, it has actually gone the other way with my wife and I contributing approximately $250,000 to the Company and a mortgage on our house to secure the line of credit with our bank.  What I have had the board of Pill Pockets approve, is to take the agreement I have personally with your mom, and make it a company obligation to be paid at each distribution of proceeds to the shareholders of Pill Pockets.  Since I control 41.84% of Pill Pockets, your mom's 5% share of my holdings translates into 2.09% of the total to the shareholders up to the cap of $100,000.

Arguably, the wording of our original letter agreement would call for this obligation to transfer to S&M Nutec since the Harold patent is one of the assets being sold.  I believe this may be irrelevant since this new agreement limits the risk of less than a full payout since we have extended the period your mom could be paid from 3 years to 13, as well as made her a part of the closing proceeds and not just sales of product.  For example, she will be paid 2.09% of the initial distribution to shareholders which we anticipate will be $700,000.  Your mom's share would therefore be $14,630 and would be paid next week.  In addition to this, without selling the first dollar of product, we have an additional $2 million to be paid over the next two years for the assets of the company where, again, your mom will receive 2.09% or $41,800.  These payments are guaranteed by S&M NuTec whether the company ever sells any product.  Of course we know they will, and the distributions to the shareholders will be made quarterly beginning this summer.  Your mom will be entitled to receive 2.09% of the amount of these distributions as well until she reaches the full $100,000.

(Id.)  Plaintiff alleges that the proposed new agreement was designed to terminate the 1997 Sale Agreement, to release McGann and PPI from their obligations under that agreement, "to defraud the Harolds from their just entitlements," and to conceal the royalty payments due to the Harolds, as well as breaches of fiduciary duty by McGann and PPI.  (Compl. ¶¶ 56-57.)

The proposed agreement that McGann and PPI sent to Plaintiff on March 3, 2005, which the Harolds never executed, would have terminated the Letter Agreement and discharge all parties and their officers, directors and agents from any claims arising from the Letter Agreement or the Patent. (Compl. Ex. H; Compl. ¶ 60.)  From the time McGann and PPI faxed the

9

agreement to the Harolds through Monday, March 7, 2005, McGann called the Harolds and left numerous messages telling them that the only way they could receive any money is if they executed the new agreement prior to the closing scheduled for March 7.  (Compl. ¶ 59.)

Plaintiff alleges upon information and belief that the transaction between PPI and S&M closed on March 7, 2005, giving McGann and PPI a minimum of $2,000,000 from S&M. (Compl. ¶ 61.)  Plaintiff also alleges that McGann and PPI failed to ensure that appropriate documents provided for the Sale Agreement to survive the sale to S&M as required by the Sale Agreement.  (Id. ¶ 63.)   Plaintiff alleges that S&M knew or should have known through the exercise of due diligence in negotiating its purchase of PPI and the Patent, that McGann and PPI were in material breach of the Sale Agreement.  (Id. ¶ 67.)

Plaintiff further alleges that PPI has had at least one patent infringement lawsuit related to the Patent which resulted in a settlement whereby the defendants made payments to PPI. (Id. at 64.)  Neither PPI nor McGann ever reported these infringement claims to the Harolds, and neither did they ever pay the Harolds any money from those claims. (Id.)

Counsel for the Harolds sent a letter to McGann and PPI on March 18, 2005 rescinding the Sale Agreement and enclosing a check to McGann for $500 and a check to PPI for $1,000. (Compl. Ex. I.)[3]  At that time, Plaintiff's counsel believed this to be the total amount of payments that the Harolds had received under the Sale Agreement; when counsel for McGann and PPI told him that $2,000 total had been paid since 1997, counsel for Plaintiff sent the balance of $500.[4]

---

[3]Plaintiff labels this letter Exhibit G, but because there is already another Exhibit G and this exhibit comes after Exhibit H, I will refer to it as Exhibit I.

[4]McGann and PPI also attach a letter from their counsel to Plaintiff's counsel as Exhibit B to their Motion to Dismiss.  The letter states that counsel's office was holding in escrow $41,514

(Compl. ¶ 66.)  Plaintiff was granted letters of administration for Decedent on March 31, 2005.

(McGann Mot. to Dis. Ex. A.)[5]


## III.  STANDARD OF REVIEW

Defendants filed these motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure.  A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal

sufficiency of the complaint.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993).  A court may

dismiss a complaint only if it appears that the plaintiff "could prove no set of facts that would

entitle him to relief."  Alston v. Parker, 363 F.3d 229, 233 (3d Cir. 2004).  A court must accept

all of the plaintiff's allegations as true and attribute all reasonable inferences in his favor.  Nami

v. Fauver, 82 F.3d 63, 65 (3d Cir.1996).  In doing so, the court need not credit plaintiff's "bald

assertions" or "legal conclusions." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir.

1997).

Both plaintiff and defendants have attached documents to their memoranda submitted on

these motions to dismiss.  "As a general matter, a district court ruling on a motion to dismiss may

not consider matters extraneous to the pleadings. However, an exception to the general rule is

that a 'document integral to or explicitly relied upon in the complaint' may be considered

---

representing 5% of sales through December 31, 2004 of the product covered by the Patent, and
that "We are prepared to release these funds immediately but only after the allegations set forth
in your letter have been withdrawn." (McGann Mot. to Dis. Ex. B.) I may consider this document
as "integral to or explicitly relied upon in the complaint," because it appears that Plaintiff derives
the breach of contract damages amounts in his Complaint from this letter.  In re Burlington Coat
Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997).

[5]I will consider this document because it is integral to Plaintiff's right to bring this lawsuit
on behalf of his father, the Decedent.

'without converting the motion [to dismiss] into one for summary judgment.' " <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir.1997).  In addition, a district court "may examine an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." <u>In re Rockefeller Center Properties, Inc. Sec. Litig.</u>, 184 F.3d 280, 287 (3d Cir.1999).

## IV.  DISCUSSION

Defendants McGann and PPI move for dismissal of all counts, and S&M moves for dismissal of the two counts against it: declaratory judgment and an equitable lien.  (McGann & PPI Mot. Dis.; S&M Mot. Dis.)   McGann and PPI assert numerous arguments for dismissal, arguing that Plaintiff cannot allege breach of contract; that rescission and avoidance are not warranted; that all of Plaintiff's tort claims are barred by the gist of the action and economic loss doctrines, as well as the two-year statute of limitations, and are unfounded; that the breach of fiduciary duty claim is barred by the gist of the action doctrine and the lack of sufficient allegations of a fiduciary relationship; and that all of Plaintiff's equitable claims fail because there is an adequate remedy at law, and the requirements of those claims are not alleged in this case.  (McGann & PPI Mot. Dis. at 2-3.)  S&M argues that the claims against it are barred because it was a bona fide purchaser for value without notice of Plaintiff's claim, and because they are equitable claims which fail because the contract with McGann and PPI provides an exclusive remedy.  (S&M Mot. Dis. at 1-2.)  For the reasons set forth below, S&M's motion is granted without prejudice, and McGann and PPI's motion is granted with respect to the equitable and tort claims in Plaintiff's Complaint.

12

A.      Violation of Fiduciary Duty/Confidential Relationship (Count I)

_____In order to plead a violation of fiduciary duty or confidential relationship, Plaintiff must

show that such a relationship existed.  The Supreme Court of Pennsylvania has held that a

confidential relationship exists when one party "has reposed a special confidence in each another

to the extent that the parties do not deal with each other on equal terms."  In re Clark's Estate,

359 A.2d 777, 781 (Pa. 1976) (internal citations omitted).  This special confidence can result

from "an overmastering dominance on one side, or weakness, dependence or justifiable trust, on

the other."  Id.   A confidential relationship exists "whenever the law recognizes that 'a party is

bound to act for the benefit of another, and can take no advantage to himself.'"  Gaines v.

Krawczyk, 354 F. Supp. 2d 573, 580 (W.D. Pa. 2004), citing Frowen v. Blank, 425 A.2d 412,

416-17 (Pa. 1980).  If such a relationship between contracting parties is found, the transaction is

presumed void unless the party defending the contract can show that he or she acted in good faith

and that the transaction is fair.  In the Matter of the Estate of Evaswe, 584 A.2d 910, 912 (Pa.

1990).  In this case Plaintiff has not pled facts sufficient to shift that burden to defendants.

        Decedent and McGann executed a contract in 1997 to benefit each of them, and the

Complaint alleges no facts to support a finding that it was anything but an ordinary business

transaction.  The Pennsylvania Supreme Court has held that "a business association may be the

basis of a confidential relationship only if one party surrenders substantial control over some

portion of his affairs to the other."  In re Estate of Missoura K. Scott, 316 A.2d 883, 886 (Pa.

1974).  In this case, the parties are unrelated and negotiated a contract at arm's length.  Their

relationship only began when McGann sent letters to Decedent seeking to purchase the Patent.

See Compl. ¶¶ 14-16.  In McGann's cover letter to the Letter Agreement, he states that he

"changed the wording in the royalty section" at Decedent's request.  (Compl. Ex. B.)  In addition, McGann referred to his attorney's opinion of the letter agreement, showing that the parties were not operating from "a position of special confidence." (Id.)  At the bottom of the letter, McGann wrote that the check he enclosed "hopefully represents the beginning of a profitable venture for us both." (Id.)  These facts do not support a finding that the parties were in a relationship where McGann could not seek a benefit of the transaction for himself.

In all the cases cited by Plaintiff where a confidential or fiduciary relationship was found, the parties had a preexisting relationship, and thus one party had a reason to place trust in the other.  See Frowen v. Blank, 425 A.2d 412 (Pa. 1981)(elderly widow sold farm to neighbor friend); Basile v. H&R Block, 777 A.2d 95 (Pa. Super. Ct. 2001)(accountant-customer relationship may be fiduciary); Francois v. Francois, 599 F.2d 1286 (3d Cir. 1979)(husband and wife where wife was the dominant partner); Tyler v. O'Neill, 994 F. Supp. 603 (E.D. Pa. 1998)(majority shareholder and bookkeeper of a corporation); Young v. Kaye, 443 Pa. 335 (1971)(employee, "friend and trustworthy advisor" for several years).  Here the relationship between the parties is a contractual one, born of the contract negotiations themselves, which were conducted by letter.

Plaintiff argues that the Complaint alleges a sufficient power differential between the parties because McGann knew that the Decedent and his wife were in "pain" and "having tough days back in 1997 and 1998." (Compl. Ex. D.)  These allegations are not enough to support a finding of a confidential relationship in a business transaction.  The Pennsylvania Supreme Court has held that

[p]hysical limitations imposed on a party to a transaction by disease and advancing age do

> not by themselves create a confidential relationship with another; such limitations support an inference of confidentiality only insofar as they may bear on a party's capacity to understand the nature of the transaction in question.

Scott, 316 A.2d at 886.  There are no allegations in the Complaint that Decedent's infirmities led him not to understand the Letter Agreement.  Instead, there is evidence that McGann altered the Agreement in response to Decedent's suggestions. (See Compl. Ex. B.)  Because Plaintiff does not allege facts to establish that a confidential or fiduciary relationship existed between the parties, the claim for breach of fiduciary duty must be dismissed.[6]


B.      Plaintiff's Breach of Contract Claims (Count II)

       Plaintiff has adequately pled breach of contract against McGann and PPI[7].  To state a claim for breach of contract, Plaintiff must only plead "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."  Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003).  The Sale Agreement at issue in this case is attached to the Complaint as Exhibit B, displaying evidence that Plaintiff and McGann executed it in May 1997.  (Compl. Ex. B; Compl. ¶¶ 17-18.)  The essential terms of the Sale Agreement are included in Exhibit B and quoted in the Complaint.  (Id.)  Thus Plaintiff

---

       [6]Plaintiff also alleges that a fiduciary relationship existed between the parties because McGann told Plaintiff in a letter that he would treat Mrs. Harold "like a shareholder of our company." (Compl. Ex. H.)  There are no allegations in the Complaint, however, that she actually was a shareholder or that the word was used in any way other than to describe the alternate payment plan that McGann was proposing.

       [7] In their Motion to Dismiss, McGann and PPI do not argue that PPI is not liable under the contract.  Because Plaintiff has pled facts that could support imposing successor liability on PPI, I will assume that PPI has the same responsibilities towards Plaintiff and Decedent as McGann does.

meets the first requirement to claim breach of contract.

As for the second requirement, Plaintiff alleges several breaches of duties imposed by the Sale Agreement.  If all the facts in the Complaint are taken as true, a reasonable jury could find that defendants breached their duties to pay royalties, to report on net sales, and to ensure that the obligations under the Sale Agreement would "survive the sale as a contingent payment obligation."[8] (Compl. Ex. B.)  The Complaint alleges that in 2003 and 2004, defendants were making net sales of product covered by the Patent, yet were not making any royalty payments to the Harolds.  (See Compl. ¶¶ 46-48.)[9]  The Complaint includes allegations that McGann never reported on net sales from May 1997 until March 2005, despite the Sale Agreement's requirement of semi-annual reports.  (Compl. ¶ 41; Compl. Ex. B.)  A jury could also find, taking the allegations in the complaint as true, that the transfers of the patent from McGann to PPI and from PPI to S&M violated the provision of the contract dealing with sale of the patent to other parties.  (Compl. ¶¶ 35-36, 63; Compl. Ex. B.)  Accordingly, Plaintiff has alleged defendants'

---

[8]Plaintiff alleges other breaches, but it is unnecessary for me to address them here, because he has clearly pled facts sufficient to support a breach of contract claim.

[9]Defendants argue that they had no obligation to make royalty payments from September 29, 2002, when Decedent died intestate, to March 31, 2005, when Plaintiff received letters of administration for his estate.  (McGann & PPI Mot. Dis. at 13-14.)  The case law cited by defendants is inapposite, because it relates to the ability of heirs to bring suit.  See Oudry-Davis v. Findley, 64 Pa. Super. 92, 93 (1916).  In Pennsylvania, "[t]he rights of the distributees are fixed at the instant of death." Brothers Estates, 40 A.2d 156, 157 (Pa. Super. Ct. 1944); See also Roberts v. Messinger, 19 A. 625 (Pa. 1890).  At any rate, Exhibit H to the Complaint is a letter from McGann repeatedly affirming his belief that Decedent's widow was her successor in interest to the Letter Agreement. (Compl. Ex. H.)  The facts as alleged could support a finding of equitable estoppel, the elements of which are one party's intentional or culpably negligent inducement of another to believe the existence of certain facts, and a resulting justifiable reliance causing prejudice if the first party denies those facts.  See Precision Door Co., Inc. v. Meridian Mut. Ins. Co., 353 F. Supp. 2d 543, 560 (E.D. Pa. 2005); Chemical Bank v. Dippolito, 897 F. Supp. 221, 224 (E.D. Pa. 1995).

breaches of duties under the Sale Agreement.

As for damages, Plaintiff has alleged in his Complaint that defendants owe over $40,000 in royalty payments.  (Compl. ¶ 54.)  Although the letter from defendants' counsel that Plaintiff appears to rely on states that $41,514 is being held in escrow for Plaintiff, the letter expressly conditions release of these funds upon withdrawal of "the allegations set forth in [Plaintiff's counsel's] letter."  (Def.'s Mot. Ex. B.)  Therefore Plaintiff has alleged damages from the breach of contract in the amount of royalties that have not been paid.  Because this allegation completes Plaintiff's claim of breach of contract, I do not dismiss the claim.

Count II is limited to contract damages and a legal accounting, however, because Plaintiff has not pled facts to support rescission or avoidance, as discussed below.


C.     Rescission and Avoidance (Counts II and XI)

Plaintiff pleads rescission in both Count II and Count XI, as well as avoidance in the alternative in Count II.   The facts in the Complaint do not support a right to either remedy. Count XI pleads rescission on the basis of misrepresentation or omission. (Compl. ¶ 97.)  Count II does not specify the grounds for rescission. (Compl. ¶ 74.)  In response to defendants' motions to dismiss, Plaintiff claims to have pled several grounds for rescission: "breach of fiduciary duty and/or confidential relationship, a material and substantial breach, a wilful refusal to pay consideration, fraud in the inducement and repudiation of the contract."  (Pl. Br. Opp. at 41.)  A closer look at the Complaint and supporting documents reveals that while Plaintiff has not in fact pled grounds adequate to support rescission, because he has an adequate remedy at law and the parties cannot be returned to their original status.

First, as explained above, Plaintiff has not alleged facts supporting the existence of a confidential relationship between the parties, and therefore rescission is not warranted on the grounds of a breach of such relationship.    Second, Plaintiff alleges a "breach so material and substantial in nature that it affects the very essence of the contract and serves to defeat the objective of the parties." Keenheel v. Commonwealth, 579 A.2d 1358, 1362 (Pa. Commw. Ct. 1990).  See also Castle v. Cohen, 676 F. Supp. 620 (E.D. Pa. 1987), aff'd in part and remanded in part, 840 F.2d 173 (3d Cir. 1988).  In Keenheel, the plaintiff seeking rescission had made an agreement with his former employer to drop his discrimination complaints against it in return for an opportunity to resign his job instead of being terminated, and a promise that the employer would not disclose his personnel records.  Id. at 498-99.  After the employer disclosed some of that information, the plaintiff sought to rescind, and the court held that a jury could find that the breach was "material and substantial" enough to warrant rescission.  Id. at 504.  In the present case, it is unclear at this stage whether Plaintiff would be able to prove a sufficiently "material and substantial" breach, but he has alleged facts tending to show a breach of obligations central to the Letter Agreement, so this could be a possible ground for rescission, were it not for the other prerequisites to rescission.

Third, the cases cited by Plaintiff to support rescission on the basis of wilful refusal to pay consideration are inapposite.  The Pennsylvania Supreme Court has found rescission appropriate in the case of land contracts when a party wilfully refuses to pay on time.  See DiPompeo v. Preston, 123 A.2d 671, 673 (Pa. 1956); Morrell v. Broadbent, 140 A. 500, 501 (Pa. 1928).  Such contracts for sale involve a simple transaction of money in exchange for a piece of property, where failure to pay consideration would be a complete failure to perform under the

contract.  Here, the circumstances are far different: a longitudinal relationship between the
parties, with McGann partially performing at the beginning by paying $500 and the renewal fee
for the patent.  (See Compl. Ex. B.)  McGann continued to pay consideration: $1000 in January
2004 and $500 in September 2004.  (Compl. Exs. F, G.)  The royalties case from the 2nd Circuit
cited by Plaintiff involved a contract specifically providing that all rights would revert from the
publisher to the authors if the publisher failed to pay royalties.[10]  Frankel v. Stein and Day, 470 F.
Supp. 209, 213 (S.D. N.Y. 1979).  These cases do not provide support for rescission on the basis
of facts as pled by the Plaintiff.

Fourth, Plaintiff has not pled facts tending to support rescission on the basis of fraudulent
inducement.  In order to comply with Federal Rule of Civil Procedure 9(b), a party asserting a
claim of fraud must plead the elements of fraud with particularity.  See Fed. R. Civ. P. 9(b); Lum
v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004).  A contract is voidable for fraudulent
inducement "[w]here a party is induced to enter into a transaction with another party that he was
under no duty to enter into by means of the latter's fraud."  College Watercolor Group, Inc. v.
William H., 360 A.2d 200, 206 (Pa. 1976), citing Restatement, Contracts, § 476 (1932).  A claim
for fraud in the inducement may rest on misrepresentation of one's true existing state of mind.
Id.  Here, Plaintiff has only made bald assertions that McGann never intended to perform his side
of the bargain, based on McGann's later alleged breaches of the contract.  In College Watercolor,
the defendant was laying the groundwork for his breach of contract before it was even made, and
breached it within a month.  Id.  In the present case, McGann wrote in 2002 that "I have never

---

[10]In Frankel, the contract provision caused the court to refer to the reversion as dependent
on a contract provision and use "rescission" in quotation marks.  Frankel, 470 F. Supp at 213.

lost my desire to get Stow Away to market, but as time went by, each opportunity seemed to have a catch that thwarted my efforts." (Compl. Ex. D.)  Beyond allegations of a later breach, Plaintiff has not pled with particularity facts to support his contention that McGann fraudulently misrepresented his intention to perform under the contract at the time the contract was entered into.  Therefore, fraud in the inducement has not adequately been pled.

Finally, Plaintiff argues that rescission is appropriate because defendants repudiate the Letter Agreement.  The Third Circuit case cited by Plaintiff holds that a *settlement agreement* may be rescinded so that the original contract claim is reinstated if the settlement agreement is repudiated, and it rests on Pennsylvania cases also discussing the revival of earlier contract claims when settlement duties are not performed.  Polish American Machinery Corp. v. R.D. & D. Corp., 760 F.2d 507 (3d Cir. 1985).  That line of cases is not applicable to this situation, where there is only one agreement and no underlying contract to fall back on the case of a rescission.  Therefore repudiation of the agreement is not a proper ground for rescission in this case.

Even if Plaintiff were able to show grounds for rescission based on material breach, the Complaint and its attachments show that two remaining prerequisites to rescission cannot be met: the parties cannot be returned to their pre-contract positions, and there is a complete remedy at law.  It is axiomatic that "a rescission can only be granted where the parties to a contract can be restored to their original positions with regard to the subject matter of the contract."  Doppler v. Doppler, 574 A.2d 1101, 1106 (Pa. Super. Ct. 1990); citing Sullivan v. Allegheny Ford Truck Sales, Inc., 423 A.2d 1292 (Pa. Super. Ct. 1980).  Courts in this District have interpreted Pennsylvania law as prohibiting rescission if "the Court's equitable powers cannot place the

20

parties in the same position that the would have been in had the contract never been formed."

Fallowfield Dev. Corp. v. Strunk, 1993 WL 157723, No. 89-cv-8644, at *18 (E.D. Pa. 1993); see

also In re Wright, 223 B.R. 886, 898 (Bkrtcy E.D. Pa. 1998); Keenheel v. Commonwealth, 579

A.2d 1358, 1361 (Pa. Commw. Ct. 1990).  Such a requirement creates an insurmountable bar in

this case.

 Plaintiff's Complaint and its attachments are replete with evidence of the money and

work that McGann and PPI put into building the Patent into a viable business.  To begin with,

McGann paid $500 to Decedent at the time the Letter Agreement was executed, and he also paid

the maintenance fee on the patent, as well as attorney fees.  (Compl. Ex. B.)  McGann's letter

from March 2002 details progress made in bringing Pill Pockets to market, including

negotiations with people in Colorado, plans to display the product at a convention, and an

impending news conference.  (Compl. Ex. D.)   In January 2004, McGann wrote that he and PPI

had built a plant in North Carolina and were manufacturing and distributing the product.

(Compl. Ex. F.)  McGann wrote in September 2004 that he had secured 14 veterinary distributors

for Pill Pockets and was "attending the larger trade shows and signing distributors to carry [their]

products."  (Compl. Ex. G.)  McGann and PPI leased a new facility, designed new and more cost

effective packaging, and leased machines to speed up production processes and reduce labor

costs. Id.  In March 2005, McGann wrote that he and his wife had contributed approximately

$250,000 to the company and had secured a line of credit with a mortgage on their house.

(Compl. Ex. H.)  Clearly, McGann and PPI had changed position substantially in reliance on

their benefit under the contract, i.e. ownership of the patent.

 Beyond terminating the rights and obligations of parties towards each other under a

contract, rescission abrogates all such rights and responsibilities "from the inception of the

contract." Metropolitan Prop. and Liab. Ins. Co. v. Penn. Ins. Commissioner, 509 A.2d 1346,

1348 (Pa. Commw. Ct.1986), *aff'd* 535 A.2d 588 (Pa. 1987).  Rescission in this case would

require returning the patent to the Harolds after McGann and PPI invested enormous effort and

capital into increasing its value.  In the time that McGann and PPI owned the Patent, they

developed a product, created a manufacturing process, built up the product's reputation, and

secured national distribution.  The facts as alleged in the complaint preclude rescission because

Plaintiff would be in a much better position than Decedent was before he sold the Patent, and it

would be impossible to restore defendants to their pre-contract position.

Finally, equitable rescission is not available in this case because the Complaint itself

shows that complete legal relief is adequate.  If there is an adequate remedy at law, a party is not

entitled to invoke the equity powers of a court to rescind a contract.  See Cabot v. Jamie Record

Co., 1999 U.S. Dist. LEXIS 5549 at *19, No. 96-cv-4672 (E.D. Pa. 1999); Casey v. Philadelphia

Auto Sales, Co., 236 A.2d 800, 802 (Pa. 1968).  In the present case, Plaintiff has alleged that his

Decedent sold all rights to the Patent to McGann for the right to payments of 5% of net sales up

to $100,000.  (Compl. Ex. B.)  Defendants are incorrect in arguing that the $3,000 cash-out

option provides Plaintiff complete relief at law.  The $3,000 is a remedy specifically designated

for "the event of unforeseen delays in the generation of sales."  (Id.)  Damages for the breaches

of contract alleged by Plaintiff could be significantly higher.  It is clear from the face of the

Complaint, however, that the most Decedent or Plaintiff could expect to get under the Letter

Agreement is damages up to a cap of $100,000.  Equitable relief will not be granted when there

is an adequate remedy at law consisting of damages.  Goadby v. Philadelphia Elec. Co., 639 F.2d

117 (3d Cir. 1981). Here Plaintiff may proceed on his breach of contract claims and recover

appropriate damages as defined by the contract. Therefore, because complete legal relief is

available, as well as for all the foregoing reasons, equitable rescission is not available.


D.      The Tort Claims (Counts III, IX, and X)

Because Plaintiff's tort claims arise out of defendant's alleged breach of duties imposed

by the contract, these tort claims are barred and must be dismissed. Under the "gist of the action"

test, Pennsylvania intermediate courts have held that plaintiffs may not recast ordinary breach of

contract claims into tort claims.[11] Bash v. Bell Tel. Co. of Pennsylvania, 601 A.2d 825, 829 (Pa.

Super. Ct. 1992). "The important difference between contract and tort actions is that the latter lie

from the breach of duties imposed as a matter of social policy while the former lie for the breach

of duties imposed by mutual consensus." Redevelopment Auth. v. International Ins. Co., 685

A.2d 581, 590 (Pa. Super. Ct. 1996). Therefore, the gist of the action is contractual if "the

parties' obligations are defined by the terms of contracts, and not by the larger social policies

embodied by the law of torts." Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79,

104 (3d Cir. 2001). In this case, Plaintiff has failed to plead a breach of duty as imposed by

mutual consensus, and only alleges facts sufficient to support a breach of contract duties.

---

[11]Although the Pennsylvania Supreme Court has neither accepted nor rejected the
doctrine, the Pennsylvania Superior Court and several U.S. District Courts have predicted that it
would. Air Products and Chemicals, Inc. v. Eaton Metal, 256 F. Supp. 2d 329, 340 (E.D. Pa.
2003), citing Etoll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. 2002);
Bash v. Bell Tel. Co. of Pennsylvania, 601 A.2d 825 (Pa. Super. 1992); Asbury Auto. Group.
LCC v. Chrysler Ins. Co., no. Civ. A. 01-3319, 2002 WL 15925 at *3 n. 3 (E.D. Pa. 2002);
Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc., 123 F. Supp. 2d 826, 833 n. 11 (E.D.
Pa. 2000).

Here Plaintiff has made several tort claims.  Plaintiff's claim for breach of fiduciary duty (Count I)  is dismissed because Plaintiff has failed to plead facts supporting the existence of a fiduciary or confidential relationship, as discussed above.  Plaintiff's claim for conversion (Count III) fails because his right to the royalties at issue arises under the contract.  Were it not for the Sale Agreement, defendants would not owe Plaintiff any money at all.[12]  Plaintiff's Claims for Fraudulent Misrepresentation (Count IX) and Constructive Fraud (Count X) fail because fraud in the performance of the Sale Agreement is barred by the gist of the action, and Plaintiff has failed to plead facts supporting fraud in the inducement, as discussed above in the context of rescission.

The Pennsylvania Superior Court, after an exhaustive survey of Pennsylvania and federal cases, has held that the gist of the action doctrine applies to claims of fraud in the performance. Etoll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 20 (Pa. Super. Ct. 2002).  The Superior Court noted that

> the cases seem to turn on the question of whether the fraud concerned the performance of contractual duties.  If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties.  If not, then the gist of the action would be the fraud, rather than any contractual relationship between the parties.

Id. at 19.  Here, Plaintiff has made many allegations that McGann and PPI misrepresented the status of sales of the product and the amount of royalties owed to Decedent and Plaintiff. (Compl. ¶ 91, 92.)  Even if these alleged misrepresentations could constitute fraud, it was fraud concerning the performance of contractual duties, including the duty to report on sales, the duty

---

[12] Plaintiff has filed a Motion for Leave to Consider the Opinion of the Honorable Norma L. Shapiro in Levert v. Philadelphia International Records, 2005 U.S. Dist LEXIS 20309 (E.D. Pa. 9/14/05), docket entry #30.  This case cannot save Plaintiff's tort claims, because Judge Shapiro found the gist of the action defense inapplicable in light of her holding that the party moving for dismissal was not a party to any contract.  Id. at *8-10.  Therefore Levert is inapplicable and Plaintiff's Motion is denied as moot in the order following this memorandum.

to pay royalties, and the duty to ensure that the Sale Agreement survived any subsequent assignment of the Patent.

McGann's allegedly fraudulent promises to honor the Sale Agreement are similar to the promises alleged in Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc., 123 F. Supp. 2d 826 (E.D. Pa. 2000). In Caudill, the court granted defendant's motion to dismiss plaintiff's fraud claims under the gist of the action doctrine, even though the plaintiff claimed that the defendant fraudulently "strung along" the plaintiff by repeatedly promising that its product would work and that it "would fulfill its end of the bargain under the agreement." Id. at 833-34. In the present case, Plaintiff similarly notes McGann's repeated assurances about the Sale Agreement as supporting his fraud claims. In Caudill, the court noted that "caution should be exercised in determining the gist of an action at the motion to dismiss stage," but granted the motion nonetheless, because the plaintiff's fraud claim was duplicative of its breach of contract claim. Id at 834. After careful examination of the Complaint and the papers before me, I do the same and dismiss Plaintiff's tort claims, including fraud, as barred by the gist of the action doctrine because the Sale Agreement is central to them.

E.    Plaintiff's Remaining Equitable Claims (Counts IV, V, VI, VIII, XII and XIII)

Plaintiff's equitable claims are not viable in this action because the relationship between the parties is based on a written contract and Plaintiff has an adequate remedy at law.   See Cabot v. Jamie Record Co., 1999 U.S. Dist. LEXIS 5549 at *19, No. 96-cv-4672 (E.D. Pa. 1999); Casey v. Philadelphia Auto Sales, Co., 236 A.2d 800, 802 (Pa. 1968). As noted above in

my rejection of Plaintiff's claim for rescission, he has an adequate remedy at law in contract damages, through a legal accounting and payment of any royalties up to the contract cap of $100,000. Neither party contests the existence of a contract between them. The Sale Agreement itself set the rights and responsibilities of both parties and decreed the outer limit of Plaintiff's royalties. (Compl. Ex. B.) Therefore equitable remedies are unavailable to Plaintiff.

The facts in the Complaint and relevant caselaw support the dismissal of each of Plaintiff's equitable claims. Although Plaintiff did not specify whether he was claiming a legal or equitable accounting in Count IV, it is clear that, at most, he is only entitled to request a legal accounting. Under Pennsylvania law,

> An equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not mutual or complicated, *or* the plaintiff possesses an adequate remedy at law.

Rock. v. Pyle, 720 A.2d 137, 142 (Pa. Super. Ct. 1998). Here, as decided above, Plaintiff has failed to properly plead the existence of a fiduciary relationship between the parties or fraud in the inducement, claims of fraud or misrepresentation in the performance of the contract are barred by the gist of the action doctrine, and Plaintiff has an adequate remedy at law. Therefore, the Plaintiff may not claim an equitable accounting.

As for Count V, the Supreme Court of Pennsylvania has held that "the quasi-contractual doctrine of unjust enrichment [is] inapplicable when the relationship between the parties is founded on a written agreement or express contract." Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh, 776 F.2d 1174 (3d Cir. 1985), quoting Schott v. Westinghouse Elec. Corp., 259 A.2d 443, 448 (Pa. 1969). Dismissal of an unjust enrichment claim is appropriate upon a motion to dismiss when the relationship between the parties is founded on a written instrument,

as here.  See Constar, Inc. v. Nat'l Distrib. Ctrs., Inc., 101 F. Supp. 2d 319, 324 (E.D. Pa. 2000);

Promark Realty Group, Inc. v. B&W Assocs., Civ. A. No. 02-1089, 2002 U.S. Dist. LEXIS 8016

at *10 (E.D. Pa. 2002).  Thus Plaintiff's claim for unjust enrichment, Count V, is properly

dismissed.

Restitution is inappropriate because the Sale Agreement expressly states the amount of

royalties that Plaintiff should receive.  Restitution is "unavailable where a contract fixes the

amount of compensation due."  Reilly Foam Corp. v. Rubbermaid Corp., 206 F. Supp. 2d 643,

659 (E.D. Pa. 2002); see also Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d

Cir. 1987); Murphy v. Haws & Burke, 344 A.2d 543, 546 (Pa. Super. Ct. 1975).  Here the parties

do not dispute the existence of a contract between them providing that Plaintiff should receive a

royalty of 5% of sales up to a cap of $100,000.  Therefore, restitution is unavailable to Plaintiff

and Count VI must be dismissed.

Plaintiff's Count VIII, "Constructive Trust - Breach of Trust - Trustee *ex Malificio*" is

similarly unsupported by the pleadings.  Besides being barred as equitable relief because of the

availability of legal relief, this Count requires pleading of fraud in the inducement or undue

influence.  (Compl. ¶ 87.)  As detailed in my discussion above related to rescission (IV.C),

Plaintiff has not pled facts to support fraud in the inducement or the existence of a special

relationship between the parties.  Therefore Count VIII must be dismissed.

Plaintiff's Claim for Declaratory Judgment (Count XII) must be dismissed because his

claim for rescission fails.  The Sale Agreement between the parties effectuated a transfer of the

Patent from Decedent to McGann.  Without rescission, which is not available in this case,

Plaintiff has no property rights over the Patent that could be threatened, and Plaintiff's requested

27

declaratory relief is inapplicable.  (See Compl. ¶¶ 99-104.)   It is within the discretion of a district court to hear or dismiss a claim for declaratory judgment.  Wilton v. Severn Falls Co., 515 U.S. 277, 287-88 (1995).  In this case declaratory judgment is unnecessary with respect to the rights and obligations of the parties because their relationship is governed by the Sale Agreement. Therefore I decline to entertain a claim for declaratory judgment, and Count XII is dismissed.

Plaintiff's claim for an equitable lien is similarly unsupported by the Complaint.  Again, Plaintiff has a legal remedy through an action for breach of contract to recover royalties owed under the Letter Agreement.  An equitable lien, as Plaintiff acknowledges, is a remedy "imposed to protect against and disgorge any unjust enrichment." (Pl.'s Resp. in Opp. at 74, citing HCB Contrs. v. Rouse & Assocs., 1992 U.S. Dist. LEXIS 9916 at *30 (E.D. Pa. 1992).)  As noted above, Plaintiff's claim for unjust enrichment must be dismissed because Plaintiff has not pled sufficient facts to warrant a rescission, and only contract remedies are appropriate.  Therefore Plaintiff's claim for an equitable lien is dismissed.[13]

## V. CONCLUSION

For the reasons set forth above, Counts I, III, IV, V, VI, VIII, IX, X, XI, XII, and XIII of the Complaint are dismissed with prejudice.  Count II is not dismissed, although rescission is not available to Plaintiff.  Therefore McGann and PPI's motion is granted in part and denied in part. Because both claims against S&M have been dismissed, S&M is dismissed from this action without prejudice to Plaintiff's assertion of a contract claim against it.   An appropriate order on

---

[13]Plaintiff labels his claim for "Imposition of Equitable Lien" as Count XI, but Count XI already refers to Equitable Rescission, so I consider the equitable lien claim to be Count XIII.

these issues was entered on December 28, 2005 (Doc. #32).


_____
ANITA B. BRODY, J.


_____Copies **VIA ECF** on           to:_____Copies **MAILED** on          to:




O:\ABB 2005\Harold MTD Memo.wpd